Leonard T. GANTLER, Patricia A. Cetrone, John Gernat, Patricia Gernat, Paul Mitchell and Marsha Mitchell, Plaintiffs Below, Appellants,

v.

William L. STEPHENS, P. James Kramer, William S. Eddy, Daniel E. Csontos, Robert I. Shaker, Lawrence Safarek and First Niles Financial, Inc., a Delaware corporation, Defendants Below, Appellees.

No. 132, 2008.

Supreme Court of Delaware.

Submitted: Nov. 5, 2008.
Decided: Jan. 27, 2009.

11. *Robertson v. State*, 596 A.2d 1345, 1355 (Del.1991).

12. *Holden v. State*, 305 A.2d 320, 322 (Del. 1973).

Norman M. Monhait and Jessica Zeldin (argued), Esquires, of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; for Appellants.

Donald J. Wolfe, Jr. and Brian C. Ralston, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware; Of Counsel: Karen Wildau, W. Scott Sorrels and Stacey Godfrey Evans (argued), Esquires, of Powell Goldstein LLP, Atlanta, Georgia; for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice.

The plaintiffs in this breach of fiduciary duty action, who are certain shareholders of First Niles Financial, Inc. ("First Niles"

or the "Company"), appeal from the dismissal of their complaint by the Court of Chancery. The complaint alleges that the defendants, who are officers and directors of First Niles, violated their fiduciary duties by rejecting a valuable opportunity to sell the Company, deciding instead to reclassify the Company's shares in order to benefit themselves, and by disseminating a materially misleading proxy statement to induce shareholder approval. We conclude that the complaint pleads sufficient facts to overcome the business judgment presumption, and to state substantive fiduciary duty and disclosure claims. We therefore reverse the Court of Chancery's judgment of dismissal and remand the case for further proceedings consistent with this Opinion.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

#### A. The Parties

First Niles, a Delaware corporation headquartered in Niles, Ohio, is a holding company whose sole business is to own and operate the Home Federal Savings and Loan Association of Niles ("Home Federal" or the "Bank"). The Bank is a federally chartered stock savings association that operates a single branch in Niles, Ohio.

The plaintiffs (Leonard T. Gantler and his wife, Patricia A. Cetrone; John and Patricia Gernat; and Paul and Marsha Mitchell) collectively own 121,715 First Niles shares. Plaintiff Gantler was a First Niles director from April 2003 until April 2006.

Defendant William L. Stephens is the Chairman of the Board, President and CEO of both First Niles and the Bank, and has been employed by the Bank since 1969. Defendant P. James Kramer, a director of First Niles and the Bank since 1994, is president of William Kramer & Son, a heating and air conditioning company in Niles that provides heating and air conditioning services to the Bank. Defendant William S. Eddy has been a director of First Niles and the Bank since 2002. Defendant Daniel E. Csontos has been a director of First Niles and the Bank since April 2006. Csontos has also been a full-time employee, serving as compliance officer and corporate secretary of both institutions since 1996 and 2003, respectively. Defendant Robert I. Shaker, who became a director of First Niles and the Bank in January of 2006 after former director Ralph A. Zuzolo passed away, is a principal of a law firm in Niles, Ohio. Defendant Lawrence Safarek is the Treasurer and Vice President of both First Niles and the Bank.

Until his death in August of 2005, Mr. Zuzolo (who is not a party) was a director and corporate board secretary of First Niles and the Bank. Zuzolo was also both a principal in the law firm of Zuzolo, Zuzolo & Zuzolo, and the CEO and sole owner of American Title Services, Inc., a real estate title company in Niles, Ohio. Zuzolo's law firm frequently provided legal services to the Bank, and American Title provided title services for nearly all of the Bank's real estate closings.[2]

---

1. The facts, which are summarized from the opinion below, are drawn from the complaint and from certain documents that the complaint incorporates by reference. *See Gantler v. Stephens*, C.A. 2392 (Del. Ch. February 14, 2008), also available at 2008 WL 401124.

2. In this Opinion, Stephens, Kramer, Eddy, Shaker and Csontos are sometimes referred to as the "Director Defendants;" and Stephens, Safarek and Csontos are sometimes referred to as the "Officer Defendants" or "Management." Collectively, these groups are referred to as the "defendants."

## B. Exploring a Potential Sale of First Niles

In late 2003, First Niles was operating in a depressed local economy, with little to no growth in the Bank's assets and anticipated low growth for the future. At that time Stephens, who was Chairman, President, CEO and founder of First Niles and the Bank, was beyond retirement age and there was no heir apparent among the Company's officers. The acquisition market for banks like Home Federal was brisk, however, and First Niles was thought to be an excellent acquisition for another financial institution. Accordingly, the First Niles Board[3] sought advice on strategic opportunities available to the Company, and in August 2004, decided that First Niles should put itself up for sale (the "Sales Process").

After authorizing the sale of the Company, the First Niles Board specially retained an investment bank, Keefe, Bruyette & Woods (the "Financial Advisor"), and a law firm, Silver, Freedman & Taft ("Legal Counsel"). At the next Board meeting in September 2004, Management advocated abandoning the Sales Process in favor of a proposal to "privatize" the Company. Under Management's proposal, First Niles would delist its shares from the NASDAQ SmallCap Market, convert the Bank from a federally chartered to a state chartered bank, and reincorporate in Maryland. The Board did not act on that proposal, and the Sales Process continued.

In December 2004, three potential purchasers—Farmers National Banc Corp. ("Farmers"), Cortland Bancorp ("Cortland"), and First Place Financial Corp. ("First Place")—sent bid letters to Stephens. Farmers stated in its bid letter that it had no plans to retain the First Niles Board, and the Board did not further pursue the Farmers' offer. In its bid letter, Cortland offered $18 per First Niles share, 49% in cash and 51% in stock, representing a 3.4% premium over the current First Niles share price. Cortland also indicated that it would terminate all the incumbent Board members, but would consider them for future service on Cortland's board. First Place's bid letter, which made no representation regarding the continued retention of the First Niles Board, proposed a stock-for-stock transaction valued at $18 to $18.50 per First Niles Share, representing a 3.4% to 6.3% premium.

The Board considered these bids at its next regularly scheduled meeting in December 2004. At that meeting the Financial Advisor opined that all three bids were within the range suggested by its financial models, and that accepting the stock-based offers would be superior to retaining First Niles shares. The Board took no action at that time. Thereafter, at that same meeting, Stephens also discussed in further detail Management's proposed privatization.

On January 18, 2005, the Board directed the Financial Advisor and Management to conduct due diligence in connection with a possible transaction with First Place or Cortland. The Financial Advisor met with Stephens and Safarek, and all three reviewed Cortland's due diligence request. Stephens and Safarek agreed to provide the materials Cortland requested and scheduled a due diligence session for February 6. Cortland failed to receive the materials it requested, canceled the February 6 meeting, and demanded the submission of those materials by February 8. The due diligence materials were never furnished, and Cortland withdrew its bid for First Niles on February 10. Management did not inform the Board of these

---

**3.** The Board members at that time were Stephens, Kramer, Eddy, Zuzolo and Gantler.

due diligence events until after Cortland had withdrawn its bid.

First Place made its due diligence request on February 7, 2005, and asked for a due diligence review session the following week. Initially, Stephens did not provide the requested materials to First Place and resisted setting a date for a due diligence session. After Cortland withdrew its bid, however, Stephens agreed to schedule a due diligence session.

First Place began its due diligence review on February 13, 2005, and submitted a revised offer to First Niles on March 4. As compared to its original offer, First Place's revised offer had an improved exchange ratio. Because of a decline in First Place's stock value, the revised offer represented a lower implied price per share ($17.25 per First Niles share), but since First Niles' stock price had also declined, the revised offer still represented an 11% premium over market price. The Financial Advisor opined that First Place's revised offer was within an acceptable range, and that it exceeded the mean and median comparable multiples for previous acquisitions involving similar banks.

On March 7, 2005, at the next regularly scheduled Board meeting, Stephens informed the directors of First Place's revised offer. Although the Financial Advisor suggested that First Place might again increase the exchange ratio, the Board did not discuss the offer. Stephens proposed that the Board delay considering the offer until the next regularly scheduled Board meeting. After the Financial Advisor told him that First Place would likely not wait two weeks for a response, Stephens scheduled a special Board meeting for March 9 to discuss the First Place offer.

On March 8, First Place increased the exchange ratio of its offer to provide an implied value of $17.37 per First Niles share. At the March 9 special Board meeting, Stephens distributed a memorandum from the Financial Advisor describing First Place's revised offer in positive terms. Without any discussion or deliberation, however, the Board voted 4 to 1 to reject that offer, with only Gantler voting to accept it. After the vote, Stephens discussed Management's privatization plan and instructed Legal Counsel to further investigate that plan.

## C. The Reclassification Proposal

Five weeks later, on April 18, 2005, Stephens circulated to the Board members a document describing a proposed privatization of First Niles ("Privatization Proposal"). That Proposal recommended reclassifying the shares of holders of 300 or fewer shares of First Niles common stock into a new issue of Series A Preferred Stock on a one-to-one basis (the "Reclassification"). The Series A Preferred Stock would pay higher dividends and have the same liquidation rights as the common stock, but the Preferred holders would lose all voting rights except in the event of a proposed sale of the Company. The Privatization Proposal claimed that the Reclassification was the best method to privatize the Company because it allowed maximum flexibility for future capital management activities, such as open market purchases and negotiated buy-backs. Moreover, First Niles could achieve the Reclassification without having to buy back shares in a fair market appraisal.

On April 20, 2005, the Board appointed Zuzolo to chair a special committee to investigate issues relating to the Reclassification, specifically: (1) reincorporating in a state other than Delaware, (2) changing the Bank's charter from a federal to a state charter, (3) deregistering from NASDAQ, and (4) delisting. However, Zuzolo passed away before any other directors were appointed to the special committee.

On December 5, 2005, Powell Goldstein, First Niles' outside counsel specially retained for the Privatization ("Outside Counsel"), orally presented the Reclassification proposal to the Board. The Board was not furnished any written materials. After the presentation, the Board voted 3 to 1 to direct Outside Counsel to proceed with the Reclassification program. Gantler cast the only dissenting vote.

Thereafter, the makeup of the Board changed. Shaker replaced Zuzolo in January of 2006, and Csontos replaced Gantler in April of 2006. From that point on, the Board consisted of Stephens, Kramer, Eddy, Shaker and Csontos.

On June 5, 2006, the Board determined, based on the advice of Management and First Niles' general counsel, that the Reclassification was fair both to the First Niles shareholders who would receive newly issued Series A Preferred Stock, and to those shareholders who would continue to hold First Niles common stock. On June 19, the Board voted unanimously to amend the Company's certificate of incorporation to reclassify the shares held by owners of 300 or fewer shares of common stock into shares of Series A Preferred Stock that would have the features and terms described in the Privatization Proposal.

### D. The Reclassification Proxy and the Shareholder Vote

On June 29, 2006, the Board submitted a preliminary proxy to the United States Securities and Exchange Commission ("SEC"). An amended version of the preliminary proxy was filed on August 10. Plaintiffs initiated this lawsuit after the amended filing, claiming that the preliminary proxy was materially false and misleading in various respects. On November 16, 2006, the Board, after correcting some of the alleged deficiencies, disseminated a definitive proxy statement ("Reclassification Proxy" or "Proxy") to the First Niles shareholders. On November 20, the plaintiffs filed an amended complaint, alleging (inter alia) that the Reclassification Proxy contained material misstatements and omissions.

In the Reclassification Proxy, the Board represented that the proposed Reclassification would allow First Niles to "save significant legal, accounting and administrative expenses" relating to public disclosure and reporting requirements under the Exchange Act.[4] The Proxy also disclosed the benefits of deregistration as including annual savings of $142,500 by reducing the number of common shareholders, $81,000 by avoiding Sarbanes–Oxley related compliance costs, and $174,000 by avoiding a one-time consulting fee to design a system to improve the Company's internal control structure. The negative features and estimated costs of the transaction included $75,000 in Reclassification-related expenses, reduced liquidity for both the to-be-reclassified preferred and common shares, and the loss of certain investor protections under the federal securities laws.

The Reclassification Proxy also disclosed alternative transactions that the Board had considered, including a cash-out merger, a reverse stock-split, an issue tender offer, expense reduction and a business combination. The Proxy stated that each of the directors and officers of First Niles had "a conflict of interest with respect to [the Reclassification] because he or she is in a position to structure it in such a way that benefits his or her interests differently from the interests of unaffiliated shareholders." The Proxy further disclosed that the Company had received one firm

---

4. 15 U.S.C. § 78a *et. seq.*

merger offer, and that "[a]fter careful deliberations, the board determined in its business judgment the proposal was not in the best interests of the Company or our shareholders and rejected the proposal."

The Company's shareholders approved the Reclassification on December 14, 2006. Taking judicial notice of the Company's Rule 13e–3 Transaction Statement,[5] the trial court concluded that of the 1,384,533 shares outstanding and eligible to vote, 793,092 shares (or 57.3%) were voted in favor and 11,060 shares abstained. Of the unaffiliated shares, however, the proposal passed by a bare 50.28% majority vote

### E. Procedural History

The amended complaint asserts three separate claims. Count I alleges that the defendants breached their fiduciary duties to the First Niles shareholders by rejecting the First Place merger offer and abandoning the Sales Process. Count II alleges that the defendants breached their fiduciary duty of disclosure by disseminating a materially false and misleading Reclassification Proxy. Count III alleges that the defendants breached their fiduciary duties by effecting the Reclassification.

The defendants moved to dismiss the complaint in its entirety. Defendants ar-

gued that Counts I and III were legally deficient for failure to allege facts sufficient to overcome the business judgment presumption; that Count II failed to state a claim that the Reclassification Proxy was materially false and misleading; and that Count III should also be dismissed because the First Niles shareholders had "ratified" the Board's decision to reclassify the First Niles shares.[6] The Court of Chancery credited these arguments and dismissed the complaint. This appeal followed.

### ANALYSIS

■■■ We review *de novo* a decision to grant a motion to dismiss under Court of Chancery Rule 12(b)(6), to "determine whether the trial judge erred as a matter of law in formulating or applying legal precepts."[7] Dismissal is appropriate only if it appears "with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff would not be entitled to relief."[8] In reviewing the grant or denial of a motion to dismiss, we view the complaint in the light most favorable to the non-moving party, accepting as true its well-pled allegations and drawing all reasonable inferences that logically flow from those allega-

---

**5.** Rules promulgated under the Exchange Act require the filing of a Rule 13e–3 transaction statement for any transaction that may result in a company reclassifying any of its securities. *See* 17 C.F.R. § 240.13e–3 (2008) ("Going Private Transactions by Certain Issuers or Their Affiliates").

**6.** The defendants also moved to dismiss Counts I and III as to Safarek and Csontos and Count III as to defendant Shaker, on the basis that these defendants were not directors during the challenged votes; and as to Csontos and Shaker for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2). The Court of Chancery dismissed Count I as

to Csontos for lack of personal jurisdiction under Rule 12(b)(2); and dismissed Count III as to Safarek, because plaintiffs had not alleged any facts from which one could infer that Safarek took part in the Board's decision to approve the Reclassification. Because plaintiffs do not appeal from those dismissals, we do not address them in this Opinion.

**7.** *Feldman v. Cutaia,* 951 A.2d 727, 730–31 (Del.2008) (quoting *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 438 (Del.2005)).

**8.** *Feldman,* 951 A.2d at 731 (quoting *VLIW Tech., LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 610–11 (Del.2003)).

tions.[9] We do not, however, blindly accept conclusory allegations unsupported by specific facts, nor do we draw unreasonable inferences in the plaintiffs' favor.[10]

## I. The Court of Chancery Erroneously Dismissed Count I of the Complaint

Count I of the complaint alleges that the defendants breached their duties of loyalty and care as directors and officers of First Niles by abandoning the Sales Process. Specifically, plaintiffs claim that the defendants improperly: (1) sabotaged the due diligence aspect of the Sales Process, (2) rejected the First Place offer, and (3) terminated the Sales Process, all for the purpose of retaining the benefits of continued incumbency.

In his opinion, the Vice Chancellor concluded that *Unocal*[11] did not apply, because the complaint did not allege any "defensive" action by the Board.[12] The court also determined entire fairness review to be inappropriate, because (1) it would be problematic to determine "fair price" without a completed transaction, (2) the Board had not interposed itself between the shareholders and a potential acquirer by implementing defensive measures, and (3) entire fairness review would be inconsistent with the broad power allocated to directors.[13]

Accordingly, the Court of Chancery analyzed Count I under the business judgment standard,[14] and concluded that the

Count I allegations failed to rebut the presumption of business judgment.[15] Because the Board had "initiated the Sales Process on its own accord, seemingly as a market check as part of an exploration of strategic alternatives[,]" that supported the Board's stated business purpose—to reduce corporate expense associated with federal securities law compliance. The Vice Chancellor also concluded that the complaint failed to plead facts sufficient to infer disloyalty,[16] and that given the Board's extensive discussions with, and receipt of reports from, the Financial Advisor, and given the involvement of specially retained Outside Counsel, the alleged facts were insufficient to establish a violation of the duty of care.[17] The court therefore concluded that the challenged conduct was entitled to business judgment protection, which required the dismissal of Count I.

The Court of Chancery separately dismissed Count I as to defendant Csontos under Court of Chancery Rule 12(b)(2), on the basis that Csontos was not a director when the Sales Process was terminated, did not hold an "officer" position enumerated in 10 *Del. C.* § 3114(b), and had not been identified by the Company as an executive officer.[18] The Court of Chancery dismissed Count I as to Safarek (in his capacity as an officer), because the pled facts were insufficient to support a reasonable inference that Safarek had acted in

9. *Feldman,* 951 A.2d at 731.

10. *In re General Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006).

11. *Unocal v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.1985).

12. *Gantler v. Stephens,* 2008 WL 401124, at *8 (Del.Ch. February 14, 2008).

13. *Id.* at *9–10.

14. *Id.* at *8–9.

15. *Id.* at *11–12.

16. *Id.* at *11.

17. *Id.*

18. *Gantler v. Stephens,* 2008 WL 401124, at *7 (Del.Ch. February 14, 2008). Plaintiffs do not appeal from that dismissal.

bad faith or without due care.[19] Lastly, the Vice Chancellor specifically found insufficient the claim that Safarek had "sabotaged" the due diligence process, because the complaint failed to allege specific facts showing that "a delay of a matter of days, or at most a couple of weeks, conceivably could be a breach of [his] fiduciary duty." [20]

On appeal, the plaintiffs claim that the legal sufficiency of Count I should have been determined under the heightened *Unocal* standard or, alternatively, under the entire fairness standard. Under either or both standards, plaintiffs urge, Count I would withstand a motion to dismiss. Additionally, plaintiffs argue that the dismissal of Safarek was error because a reasonable inference could be drawn that Safarek had actively sabotaged the due diligence process, thereby aiding and abetting Stephens' duty of loyalty violation.

We conclude that the Court of Chancery erroneously dismissed Count I of the complaint for the reasons next discussed.

### A. The Court of Chancery Properly Refused to Apply Unocal Scrutiny

The plaintiffs first challenge the Vice Chancellor's determination that Count I was not subject to review under *Unocal.* We agree with that ruling and find no error. "Enhanced judicial scrutiny under *Unocal* applies 'whenever the record reflects that a board of directors took defensive measures in response to a perceived threat to corporate policy and effec-

tiveness which touches on issues of control.' " [21] The plaintiffs argue that *Unocal* should apply because Count I alleges that the defendants rejected a value-maximizing bid in favor of a transaction that favored their self-interest at the shareholders' expense. Stated differently, plaintiffs argue that Count I, fairly read, alleges that the defendants stood to lose the benefits of corporate control if the Company were sold, and that they therefore took defensive action by sabotaging the due diligence process, rejecting the First Place offer, and terminating the Sales Process.

The Court of Chancery properly refused to apply *Unocal* in this fashion. The premise of *Unocal* is "that the transaction at issue was defensive." [22] Count I sounds in disloyalty, not improper defensive conduct. Count I does not allege any hostile takeover attempt or similar threatened external action from which it could reasonably be inferred that the defendants acted "defensively." [23]

### B. The Court of Chancery Misapplied the Business Judgment Standard

The plaintiffs next claim that the legal sufficiency of Count I should have been reviewed under the entire fairness standard. That claim is assessed within the framework of the business judgment standard, which is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that

**19.** *Id.*

**20.** *Id.*

**21.** *In re Santa Fe Pac. Corp., S'holder Litig.,* 669 A.2d 59, 71 (Del.1995) (quoting *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1372 n. 9 (Del.1995)).

**22.** *Shamrock Hldgs, Inc. v. Polaroid Corp.,* 559 A.2d 257, 271 (Del.Ch.1989).

**23.** Rejecting an acquisition offer, without more, is not "defensive action" under *Unocal. See Kahn v. MSB Bancorp, Inc.,* 1998 WL 409355, at *3–4 (Del.Ch. July 16, 1998), *aff'd,* 734 A.2d 158 (Table) (Del.1999) (holding local savings bank's board's rejection of merger offers was not a defensive action under *Unocal.)*

the action taken was in the best interests of the company." [24]

Procedurally, the plaintiffs have the burden to plead facts sufficient to rebut that presumption. [25] On a motion to dismiss, the pled facts must support a reasonable inference that in making the challenged decision, the board of directors breached either its duty of loyalty or its duty of care. [26] If the plaintiff fails to satisfy that burden, "a court will not substitute its judgment for that of the board if the ... decision can be 'attributed to any rational business purpose.'" [27]

We first consider the sufficiency of Count I as against the Director Defendants. That Count alleges that those defendants (together with non-party director Zuzolo) improperly rejected a value-maximizing bid from First Place and terminated the Sales Process. Plaintiffs allege that the defendants rejected the First Place bid to preserve personal benefits, including retaining their positions and pay as directors, as well as valuable outside business opportunities. The complaint further alleges that the Board failed to deliberate before deciding to reject the First Place bid and to terminate the Sales Process. Indeed, plaintiffs emphasize, the Board retained the Financial Advisor to advise it on the Sales Process, yet repeatedly disregarded the Financial Advisor's advice.

A board's decision not to pursue a merger opportunity is normally reviewed within the traditional business judgment framework. [28] In that context the board is entitled to a strong presumption in its favor, because implicit in the board's statutory authority to propose a merger, is also the power to decline to do so. [29]

Our analysis of whether the Board's termination of the Sales Process merits the business judgment presumption is two pronged. First, did the Board reach its decision in the good faith pursuit of a legitimate corporate interest? Second, did the Board do so advisedly? [30] For the Board's decision here to be entitled to the business judgment presumption, both questions must be answered affirmatively.

We consider first whether Count I alleges a cognizable claim that the Board breached its duty of loyalty. In *TW Services v. SWT Acquisition Corporation,* the Court of Chancery recognized that a board's decision to decline a merger is often rooted in distinctively corporate concerns, such as enhancing the corporation's long term share value, or "a plausible concern that the level of debt likely to be borne by [the target company] following any merger would be detrimental to the long term function of th[at] [c]ompany." A good faith pursuit of legitimate concerns of

---

**24.** *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984) (internal citations omitted).

**25.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162 (Del.1995).

**26.** *McMullin v. Beran,* 765 A.2d 910, 917 (Del.2000); *Emerald Partners v. Berlin,* 726 A.2d 1215, 1221 (Del.1999).

**27.** *Unocal v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985) (quoting *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971)).

**28.** *TW Servs., Inc. v. SWT Acquisition Corp.,* 1989 WL 20290, at *11 (Del.Ch. March 2, 1989).

**29.** *See* 8 *Del. C.* § 251 for the grant of authority to enter into a merger; *see also TW Servs.,* 1989 WL 20290, at *10–11; *see generally Kahn v. MSB Bancorp, Inc.,* 1998 WL 409355 (Del.Ch. July 16, 1998), *af'd,* 734 A.2d 158 (Table) (Del.1999) (describing a board's power under Section 251 and reviewing a decision not to negotiate a merger under the business judgment standard).

**30.** *TW Servs.,* 1989 WL 20290, at *10–11.

this kind will satisfy the first prong of the analysis.[31]

■ Here, the plaintiffs allege that the Director Defendants had a disqualifying self-interest because they were financially motivated to maintain the status quo. A claim of this kind must be viewed with caution, because to argue that directors have an entrenchment motive solely because they could lose their positions following an acquisition is, to an extent, tautological. By its very nature, a board decision to reject a merger proposal could always enable a plaintiff to assert that a majority of the directors had an entrenchment motive. For that reason, the plaintiffs must plead, in addition to a motive to retain corporate control, other facts sufficient to state a cognizable claim that the Director Defendants acted disloyally.[32]

■ The plaintiffs have done that here. At the time the Sales Process was terminated, the Board members were Stephens, Kramer, Eddy, Zuzolo and Gantler. Only Gantler voted to accept the First Place merger bid. The pled facts are sufficient to establish disloyalty of at least three (*i.e.,* a majority) of the remaining directors, which suffices to rebut the business judgment presumption. First, the Reclassification Proxy itself admits that the Company's directors and officers had "a conflict of interest with respect to [the Reclassification] because he or she is in a position to structure it in a way that benefits his or her interests differently from the interest of the unaffiliated stockholders." Second, a director-specific analysis establishes (for Rule 12(b)(6) purposes) that a majority of the Board was conflicted.

*Stephens:* Aside from Stephens losing his long held positions as President, Chairman and CEO of First Niles and the Bank, the plaintiffs have alleged specific conduct from which a duty of loyalty violation can reasonably be inferred. Stephens never responded to Cortland's due diligence request. The Financial Advisor noted that Stephens' failure to respond had caused Cortland to withdraw its bid. Even after Cortland had offered First Niles an extension, Stephens did not furnish the necessary due diligence materials, nor did he inform the Board of these due diligence problems until after Cortland withdrew. Cortland had also explicitly stated in its bid letter that the incumbent Board would be terminated if Cortland acquired First Niles. From these alleged facts it may reasonably be inferred that what motivated Stephens' unexplained failure to respond promptly to Cortland's due diligence request was his personal financial interest, as opposed to the interests of the shareholders. That same inference can be drawn from Stephens' response to the First Place bid: Count I alleges that Stephens attempted to "sabotage" the First Place due diligence request in a manner similar to what occurred with Cortland.

Thus, the pled facts provide a sufficient basis to conclude, for purposes of a Rule 12(b)(6) motion to dismiss, that Stephens acted disloyally.

---

31. *Id.* at *11.

32. *See Pogostin v. Rice,* 480 A.2d 619, 627 (Del.1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000) ("plaintiffs have failed to plead any facts supporting their claim[s] that the ... board rejected the ... offer solely to retain control. Rather, plaintiffs seek to establish a motive or primary purpose to retain control only by showing that the ... board opposed a tender offer. Acceptance of such an argument would condemn any board, which successfully avoided a takeover, regardless of whether that board properly determined that it was acting in the best interests of the shareholders.").

*Kramer:* Director Kramer's alleged circumstances establish a similar disqualifying conflict. Kramer was the President of William Kramer & Son, a heating and air conditioning company in Niles that provided heating and air conditioning services to the Bank. It is reasonable to infer that Kramer feared that if the Company were sold his firm would lose the Bank as a client. The loss of such a major client would be economically significant, because the complaint alleges that Kramer was a man of comparatively modest means, and that his company had few major assets and was completely leveraged. Because Kramer would suffer significant injury to his personal business interest if the Sales Process went forward, those pled facts are sufficient to support a reasonable inference that Kramer disloyally voted to terminate the Sales Process and support the Privatization Proposal.

*Zuzolo:* As earlier noted, Director Zuzolo was a principal in a small law firm in Niles that frequently provided legal services to First Niles and the Bank. Zuzolo was also the sole owner of a real estate title company that provided title services in nearly all of Home Federal's real estate transactions. Because Zuzolo, like Kramer, had a strong personal interest in having the Sales Process not go forward, the same reasonable inferences that flow from Kramer's personal business interest can be drawn in Zuzolo's case.

In summary, the plaintiffs have alleged facts sufficient to establish, for purposes of a motion to dismiss, that a majority of the First Niles Board acted disloyally. Because a cognizable claim of disloyalty rebuts the business judgment presumption, we need not reach the separate question of whether, in deciding to terminate the Sales Process, the Director Defendants acted advisedly (*i.e.*, with due care). Because the claim of disloyalty was subject to entire fairness review, the Court of Chancery erred in dismissing Count I as to the Director Defendants on the basis of the business judgment presumption.[33]

■■■■■ In dismissing Count I as to the Officer Defendants, the Court of Chancery similarly erred. The Court of Chancery has held, and the parties do not dispute, that corporate officers owe fiduciary duties that are identical to those owed by corporate directors.[34] That issue—whether or not officers owe fiduciary duties identical to those of directors—has been characterized as a matter of first impression for this Court.[35] In the past, we have implied that officers of Delaware corporations, like di-

---

**33.** The Court of Chancery determined that entire fairness review was inappropriate, because: (1) it would be problematic to determine "fair price" without a completed transaction, (2) the Board did not interpose itself between the shareholders and a potential acquirer by implementing any defensive measures, and (3) entire fairness review would be inconsistent with Delaware's broad allocation to power to directors. *See Gantler v. Stephens,* 2008 WL 401124, at *9–10 (Del.Ch. February 14, 2008). Although it may be problematic to determine the fair price of a transaction that was never finalized, our decisions have applied the entire fairness standard in a non-transaction context. *See Nixon v. Blackwell,* 626 A.2d 1366, 1376 (Del.1993) (applying the fair dealing prong of entire fair-

ness). That the Board did not implement any impermissible defensive measures does not, *ipso facto*, insulate their actions from entire fairness review. Nor does Delaware's broad allocation of power to directors require less searching review where shareholders are able to establish a cognizable claim of self-interested director behavior.

**34.** *See, e.g., Ryan v. Gifford,* 935 A.2d 258, 266 (Del.Ch.2007).

**35.** *See, e.g., In re Walt Disney Co., Deriv. Litig.,* 2004 WL 2050138, at *3 (Del.Ch. September 10, 2004) ("To date, the fiduciary duties of officers have been assumed to be identical to those of directors.") (citations omitted).

rectors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors.[36] We now explicitly so hold.[37] The only question presented here is whether the complaint alleges sufficiently detailed acts of wrongdoing by Stephens and Safarek to state a claim that they breached their fiduciary duties as officers. We conclude that it does.

Stephens and Safarek were responsible for preparing the due diligence materials for .the three firms that expressed an interest in acquiring First Niles. The alleged facts that make it reasonable to infer that Stephens violated his duty of loyalty as a director, also establish his violation of that same duty as an officer. It also is reasonably inferable that Safarek aided and abetted Stephens' separate loyalty breach. Safarek, as First Niles' Vice President and Treasurer, depended upon Stephen's continued good will to retain his job and the benefits that it generated. Because Safarek was in no position to act independently of Stephens, it may be inferred that by assisting Stephens to "sabotage" the due diligence process, Safarek also breached his duty of loyalty.

The Court of Chancery found otherwise. Having characterized Safarek's actions as causing "a delay of a matter of days, or at most a couple of weeks," the Vice Chancellor observed that he could not see how that "conceivably could be a breach of Safarek's

fiduciary duties."[38] This analysis is inappropriate on a motion to dismiss. The complaint alleges that Safarek never responded to Cortland's due diligence requests and that as a result, Cortland withdrew a competitive bid for First Niles. Those facts support a reasonable inference that Safarek and Stephens attempted to sabotage the Cortland and First Place due diligence process. On a motion to dismiss, the Court of Chancery was not free to disregard that reasonable inference, or to discount it by weighing it against other, perhaps contrary, inferences that might also be drawn. By dismissing Count I as applied to Stephens and Safarek as officers of First Niles, the trial court erred.

## II. The Court of Chancery Erroneously Dismissed Count II of the Complaint

In granting defendants' motion to dismiss Count II, the Court of Chancery ruled that the defendants' allegedly misleading disclosures and non-disclosures relating to the Sales Process and Reclassification were immaterial, because they did not alter the "total mix" of information available to shareholders.[39] Plaintiffs appeal only from certain of those materiality rulings. With respect to the Sales Process, the plaintiffs claim that the complaint adequately alleges that the defendants failed to disclose: (i) the circumstances of Cortland's withdrawal and (ii) insufficient

---

**36.** That officers and directors of Delaware corporations have identical fiduciary duties has long been an articulated principle of Delaware law. *See, e.g., Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del.1939) (discussing the duty of loyalty applicable to officers and directors); *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993) (same).

**37.** That does not mean, however, that the consequences of a fiduciary breach by directors or officers, respectively, would necessarily be the same. Under 8 *Del. C.*

§ 102(b)(7), a corporation may adopt a provision in its certificate of incorporation exculpating its directors from monetary liability for an adjudicated breach of their duty of care. Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers.

**38.** *Gantler v. Stephens,* 2008 WL 401124, at *7 (Del.Ch. February 14, 2008).

**39.** *Id.* at *20.

deliberations by the Board before deciding to reject the First Place bid.[40] With respect to the Reclassification, plaintiffs claim that the complaint adequately alleges that (iii) the defendants were motivated by a desire to increase their ability to effect stock buy-backs and increase the liquidity of participants in the Employee Stock Ownership Plan ("ESOP").[41] By holding otherwise, plaintiffs contend, the Court of Chancery reversibly erred.

We conclude that the Proxy disclosures concerning the Board's deliberations about the First Place bid were materially misleading. Because we reverse the dismissal of Count II on that basis, we do not reach the plaintiffs' remaining disclosure claims.

### A. The Materiality Standard

■■■ It is well-settled law that "directors of Delaware corporations [have] a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[42] That duty "attaches to proxy statements and any other disclosures in contemplation of stockholder action."[43] The essential inquiry here is whether the alleged omission or misrepresentation is material. The burden of establishing materiality rests with the plaintiff, who must demonstrate "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[44]

### B. Misrepresentations Relating to the Sales Process

■■■ In the Reclassification Proxy, the Board disclosed that "[a]fter careful deliberations, the board determined in its business judgment that the [First Place merger] proposal was not in the best interest of the Company or our shareholders and rejected the [merger] proposal." Although boards are "not required to disclose all available information[,] ..."[45] "once [they] travel[ ] down the road of partial disclosure of ... [prior bids] us[ing] ... vague language ..., they ha[ve] an obligation to

---

**40.** The Vice Chancellor found those claims immaterial. *Id.* at *20.

**41.** The Vice Chancellor found that claim immaterial at *Gantler*, 2008 WL 401124, at *22.

**42.** *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992); *In re Staples, Inc., S'holders Litig.*, 792 A.2d 934, 953–54 (Del.Ch.2001) ("The basic legal standard applicable ... is well-established and deceptively easy to state: the defendant directors have the duty to disclose in a non-misleading manner all material facts bearing on the decision of ... whether to approve the Reclassification.").

**43.** *Arnold v. Soc'y for Savings Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del.1994) (citing *Stroud*, 606 A.2d at 85; *Blasius v. Atlas Corp.*, 564 A.2d 651, 659 n. 2 (Del.Ch.1988)).

**44.** *Id.*(citing *Stroud*, 606 A.2d at 84). We have defined "materiality" as follows:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Arnold*, 650 A.2d at 1277 (citations and emphasis omitted).

**45.** *Stroud*, 606 A.2d at 85, *see also McMillan v. Intercargo Corp.*, 1999 WL 288128, at *9 (Del.Ch. May 3, 1999) (directors do not have to disclose "all of the ... bends and turns in the road ...") (citations omitted).

provide the stockholders with an accurate, full, and fair characterization of those historic events." [46]

By stating that they "careful[ly] deliberat[ed]," the Board was representing to the shareholders that it had considered the Sales Process on its objective merits and had determined that the Reclassification would better serve the Company than a merger. The Court of Chancery found, however, that the Board's Reclassification Proxy disclosure of "careful deliberations" about terminating the Sales Process was immaterial, because it would not alter the total mix of information to "omit[ ] that phrase in its entirety." [47] We disagree and conclude that that disclosure was materially misleading.

The Reclassification Proxy specifically represented that the First Niles officers and directors "ha[d] a conflict of interest with respect to the [Reclassification] because he or she is in a position to structure it in a way that benefits his or her interests differently from the interests of unaffiliated shareholders." Given the defendant fiduciaries' admitted conflict of interest, a reasonable shareholder would likely find significant—indeed, reassuring—a representation by a conflicted Board that the Reclassification was superior to a potential merger which, after "careful deliberations," the Board had "carefully considered" and rejected. In such circumstances, it cannot be concluded as a matter of law, that disclosing that there was little or no deliberation would not alter the total mix of information provided to the shareholders.

The Vice Chancellor's finding that the challenged phrase could have been omitted in its entirety has the same infirmity. Had the "careful deliberations" representation never been made, the shareholders might well have evaluated the Reclassification more skeptically, and perhaps even less favorably on its merits, for two reasons. First, the shareholders would have had no information about the Reclassification's desirability vis-à-vis other alternatives. Second, they were told that the Board and Management had a conflict of interest in the one transaction that their fiduciaries had determined to endorse.

We are mindful of the case law holding that a corporate board is not obligated to disclose in a proxy statement the details of merger negotiations that have "gone south," since such information "would be [n]either viably practical [n]or material to shareholders in the meaningful way intended by ... case law." [48] Even so, a board cannot properly claim in a proxy statement that it had carefully deliberated and decided that its preferred transaction better served the corporation than the alternative, if in fact the Board rejected the alternative transaction without serious consideration. The complaint's allegation that at its March 9, 2005 meeting the Board voted to reject a merger with First Place without any discussion, supports a reasonable inference that the Board did not "carefully deliberate" on the merits of that transaction.

The defendants respond with a factual argument: even if the Board did not discuss the First Place offer at the March 9 meeting, it does not follow that the Board acted without sufficient deliberation. The reason, defendants say, is that the directors had received information relating

46. *Arnold,* 650 A.2d at 1280 (citations omitted).

47. *Gantler v. Stephens,* 2008 WL 401124, at *20 (Del.Ch. February 14, 2008).

48. *State of Wisc. Inv. Bd. v. Bartlett,* 2000 WL 238026, at *8 (Del.Ch. February 24, 2000); *see also McMillan v. Intercargo Co.,* 1999 WL 288128, at *9 (Del.Ch. May 3, 1999).

to that offer, and the Sales Process had been discussed at other meetings. The difficulty with this argument is that it is based on facts outside the record that the court may properly consider on a motion to dismiss. That is, the defendants' argument requires considering facts not before the court, which on a motion to dismiss is inappropriate.

On this basis, the dismissal of Count II must be reversed. We therefore do not address or decide the remaining claimed disclosure violations. .

### III. *The Court of Chancery Erroneously Dismissed Count III of the Complaint*

Finally, we address the issues generated by the dismissal of Count III. That Count alleges that the defendants breached their duty of loyalty by recommending the Reclassification Proposal to the shareholders for purely self-interested reasons (to enlarge their ability to engage in stock buybacks and to trigger their ESOP put and appraisal rights). The Court of Chancery determined that the relevant Board for analytical purposes was the June 2006 Board that voted to effect the Reclassification, because at any earlier time the Board could have decided to abandon the transaction.[49] The Vice Chancellor then concluded that the complaint sufficiently alleged that a majority of the directors that approved the Reclassification Proposal lacked independence.[50] Despite having so concluded, the court dismissed the claim on the ground that a disinterested majority of the shareholders had "ratified" the Reclassification by voting to approve it.[51]

The plaintiffs claim that this ratification ruling is erroneous as a matter of law. They argue that because the Proxy disclosures were materially misleading, no fully informed shareholder vote took place. The plaintiffs also urge that in determining the number of unaffiliated shares that were voted, the Court of Chancery took improper judicial notice of shares owned by the defendants. The defendants respond that the Vice Chancellor's ratification ruling is correct and should be upheld. Alternatively, they argue that we should overturn the Vice Chancellor's determination that the Board had a disqualifying self-interest.

We conclude that the Court of Chancery legally erred in upholding Count III on shareholder ratification grounds, for two reasons. First, because a shareholder vote was required to amend the certificate of incorporation, that approving vote could not also operate to "ratify" the challenged conduct of the interested directors. Second, the adjudicated cognizable claim that the Reclassification Proxy contained a material misrepresentation, eliminates an essential predicate for applying the doctrine, namely, that the shareholder vote was fully informed.

### A. *The Doctrine of Shareholder Ratification*

Under current Delaware case law, the scope and effect of the common law doctrine of shareholder ratification is unclear, making it difficult to apply that doctrine in a coherent manner. As the Court of Chancery has noted in *In re Wheelabrator*

---

49. *Gantler*, 2008 WL 401124, at *12. That Board consisted of Stephens, Eddy, Kramer, Shaker, and Csontos.

50. *Id.* at *15.

51. *Id.* at *23. The court also dismissed Count III with respect to Safarek, concluding that "[p]laintiffs allege no facts from which I can infer Safarek, as an officer, took part in the Board's decisions relating to the Reclassification." *Id.* at *13. The plaintiffs do not appeal that dismissal of Safarek.

*Technologies, Inc., Shareholders Litigation*:

> [The doctrine of ratification] might be thought to lack coherence because the decisions addressing the effect of shareholder "ratification" have fragmented that subject into three distinct compartments, ... In its "classic" ... form, shareholder ratification describes the situation where shareholders approve board action that, legally speaking, could be accomplished without any shareholder approval.... "[C]lassic" ratification involves the voluntary addition of an independent layer of shareholder approval in circumstances where shareholder approval is not legally required. But "shareholder ratification" has also been used to describe the effect of an informed shareholder vote that was statutorily required for the transaction to have legal existence.... That [the Delaware courts] have used the same term is such highly diverse sets of factual circumstances, without regard to their possible functional differences, suggests that "shareholder ratification" has now acquired an expanded meaning intended to describe any approval of challenged board action by a fully informed vote of shareholders, irrespective of whether that shareholder vote is legally required for the transaction to attain legal existence.[52]

■■■■■ To restore coherence and clarity to this area of our law, we hold that the scope of the shareholder ratification doctrine must be limited to its so-called "classic" form; that is, to circumstances where a fully informed shareholder vote approves director action that does *not* legally require shareholder approval in order to become legally effective. Moreover, the only director action or conduct that can be ratified is that which the shareholders are specifically asked to approve.[53] With one exception, the "cleansing" effect of such a ratifying shareholder vote is to subject the challenged director action to business judgment review, as opposed to "extinguishing" the claim altogether (*i.e.*, obviating all judicial review of the challenged action).[54]

---

52. 663 A.2d 1194, 1202 and n. 4 (Del.Ch. 1995) (citations omitted). *See also Solomon v. Armstrong*, 747 A.2d 1098, 1114–15 (Del. Ch.1999), *aff'd*, 746 A.2d 277 (Table) (Del. 2000) ("The legal effect of shareholder ratification, as it relates to alleged breaches of the duty of loyalty, may be one of the most tortured areas of Delaware law. A different rule exists for every permutation of facts that fall under the broad umbrella of "duty of loyalty" claims.").

53. We previously so held in *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del.1995), which involved a claim that by adopting defensive measures to block an unsolicited takeover bid, the directors of the target corporation breached their fiduciary duties. The Court of Chancery held that that claim had been extinguished by the "ratifying" shareholder vote approving a subsequent merger of the target corporation. Reversing that ruling, this Court held that "[s]ince the stockholders of Santa Fe merely voted in favor of the merger and not the defensive measures, we decline to find ratification in this instance."

54. To the extent that *Smith v. Van Gorkom* holds otherwise, it is overruled. 488 A.2d 858, 889–90 (Del.1985). The only species of claim that shareholder ratification can validly extinguish is a claim that the directors lacked the authority to take action that was later ratified. Nothing herein should be read as altering the well-established principle that void acts such as fraud, gift, waste and ultra vires acts cannot be ratified by a less than unanimous shareholder vote. *See Michelson v. Duncan*, 407 A.2d 211, 219 (Del.1979) ("[W]here a claim of gift or waste of assets, fraud or [u]ltra vires is asserted that a less than unanimous shareholder ratification is not a full defense."); *see also Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 896 (Del. Ch.1999) (explaining that ultra vires, fraud, and gift or waste of corporate assets are "void" acts that cannot be ratified by less

### B. Applying the Doctrine to the Shareholders' Approval of the Reclassification Proposal

 The Court of Chancery held that although Count III of the complaint pled facts establishing that the Reclassification Proposal was an interested transaction not entitled to business judgment protection, the shareholders' fully informed vote "ratifying" that Proposal reinstated the business judgment presumption. That ruling was legally erroneous, for several reasons. First, the ratification doctrine does not apply to transactions where shareholder approval is statutorily required. Here, the Reclassification could not become legally effective without a statutorily mandated shareholder vote approving the amendment to First Niles' certificate of incorporation. Second, because we have determined that the complaint states a cognizable claim that the Reclassification Proxy was materially misleading (*see* Part II, *supra*, of this Opinion), that precludes ruling at this procedural juncture, as a matter of law, that the Reclassification was fully informed. Therefore, the approving shareholder vote did not operate as a "ratification" of the challenged conduct in any legally meaningful sense.[55]

Alternatively, the defendants urge that, apart from ratification, Count III was properly dismissed because the Board was not interested, and that the Vice Chancellor's contrary ruling is erroneous. That argument lacks merit both procedurally and substantively. Procedurally it lacks merit because the Court of Chancery expressly determined that a majority of the Board was interested, and the Defendants have not cross-appealed from that ruling. Substantively, the argument lacks merit, because the defendants concede that Stephens and Csontos were interested in the Reclassification, and our earlier analysis of Kramer's alleged disloyalty with respect to Count I applies equally to Count III.[56] These allegations require that the Vice Chancellor's determination that a majority of the Board was interested be sustained.

We conclude that the Court of Chancery erroneously dismissed Count III of the complaint.

### CONCLUSION

For the foregoing reasons, the judgment of the Court of Chancery is reversed as to all counts and remanded for proceedings consistent with the rulings in this Opinion.

---

than unanimous shareholder consent.) *accord Solomon v. Armstrong,* 747 A.2d at 1115. "Voidable" acts are those beyond management's powers, but where they are performed in the best interests of the corporation they may be ratified by a majority vote of disinterested shareholders. *See Michelson,* 407 A.2d at 219.

To avoid confusion about the doctrinal clarifications set forth in Part III A of this Opinion, we note that they apply only to the common law doctrine of shareholder ratification. They are not intended to affect or alter our jurisprudence governing the effect of an approving vote of disinterested shareholders under 8 *Del. C.* § 144.

**55.** We have previously suggested this result in *Williams v. Geier,* 671 A.2d 1368, 1379 n. 24 (Del.1996) (dictum). This Opinion clarifies that "ratification" legally describes only corporate action where stockholder approval is not statutorily required for its effectuation.

**56.** The complaint's allegations support a reasonable inference that Kramer was motivated by the prospect of preserving the Bank as a client for his heating and air conditioning company, and thus, voted for Reclassification to keep the Bank as a client.