[No. B212672. Second Dist., Div. Eight. May 21, 2010.]

ELLIOTT M. FOX, Plaintiff, v.
JAMDAT MOBILE, INC., et al., Defendants and Respondents;
NECA-IBEW PENSION FUND, Intervener and Appellant.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*It is ordered that the above entitled matter be published with the exception of parts A.2., A.3. and B. of the Discussion.

**COUNSEL**

Robbins Geller Rudman & Dowd, Randall J. Baron, Kevin K. Green and David T. Wissbroecker for Intervener and Appellant.

Fenwick & West, Kevin P. Muck, Felix S. Lee and Christine A. Vogelei for Defendants and Respondents.

## OPINION

**RUBIN, J.**—Appellant NECA-IBEW Pension Fund (Fund) intervened in a stockholder's action filed by Elliott M. Fox (not a party to this appeal) against respondents JAMDAT Mobile, Inc. (JAMDAT), Paul A. Vais, J. William Gurley, Mitch Lasky, Henk B. Rogers and Michael M. Lynton (collectively the individual defendants). Respondents' demurrer to appellant's complaint was sustained without leave to amend. The principal issue is whether Fund's complaint, which consists of a single cause of action, states facts sufficient for a cause of action for breach of fiduciary duties. We find that it does as to the individual defendants and therefore reverse the judgment as to those defendants. We affirm the trial court's ruling as to JAMDAT.

## FACTS

### 1. *Introduction*

This proposed class action on behalf of holders of JAMDAT common stock arises out of the acquisition of JAMDAT by Electronic Arts Inc. (EA) for $27 per share. Both the acquisition process and the price are alleged to have been unfair.[1]

JAMDAT publishes wireless entertainment applications, including games, ringtones, images and other entertainment applications in the United States and internationally. JAMDAT, a Delaware corporation, is headquartered in Los Angeles. At the time of its acquisition by EA, JAMDAT was still growing, with an internal growth rate in excess of 30 percent, and earned cash at a rate that allowed EA to recoup the purchase money for JAMDAT in a relatively short period of time.

There were more than 24.8 million shares of JAMDAT common stock at the time of the acquisition. The price paid by EA, $27 per share, was only 18.6 percent over JAMDAT's public trading price on the day before the acquisition by EA was announced and it was below JAMDAT's highest share price of $32.50 during the 60 days preceding the acquisition.

---

[1] Our factual recitation is based on the allegations in the complaint. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459 [80 Cal.Rptr.2d 329].)

Respondent Lasky was JAMDAT's chief executive officer and chairman of the board of directors. Respondents Vais, Gurley and Lynton were directors of JAMDAT. Vais was also a vice-president of Apax Managers, Inc., which owned 15.03 percent of JAMDAT stock. Gurley was a managing member of Benchmark Capital Management Co. IV, which owned 10.15 percent of JAMDAT's stock. Respondent Rogers had sold a leading wireless publisher, Blue Lava Wireless, to JAMDAT for $137 million; Blue Lava's principal asset was a 15-year worldwide license to the wireless rights for Tetris, one of the most popular games ever made. As a part of this deal, Rogers became a director of JAMDAT. These five individuals constituted the entire board of directors.

Appellant Fund is a shareholder of JAMDAT.

EA owns a valuable stable of video games. The merger of EA and JAMDAT allowed EA to take advantage of both JAMDAT's proprietary technology for mobile game deployment and its expansive mobile game catalog, which included Tetris.

2.  *August–September 2005*

Lasky met for the first time with EA's vice-president of corporate development, Owen Mahoney, on August 29, 2005, to discuss the acquisition of JAMDAT by EA. Lasky and Mahoney continued this discussion in September. At the end of September, Lasky met with EA's chief executive officer to discuss the more detailed specifics of an acquisition.

In September, Lasky also entered into discussions with Yahoo! about the possible acquisition of JAMDAT by Yahoo!

JAMDAT entered into confidentiality agreements with Yahoo! and EA respectively in September and early in October. At the time of the EA agreement, Mahoney asked Lasky whether JAMDAT would enter into an exclusivity agreement with EA; such an agreement, which was eventually concluded, would prevent JAMDAT from negotiating with any other potential buyers. At this point, Lasky had not informed the full board of directors that he was contemplating the sale of JAMDAT.

3.  *October 2005*

On October 7, 2005, Lasky disclosed for the first time to the full board that he had been talking to EA and Yahoo! about a possible sale of JAMDAT.

Lasky did not tell the board, however, about the confidentiality agreements with EA and Yahoo!, nor did he disclose that he was considering giving EA exclusivity.

On October 19, 2005, JAMDAT hired Credit Suisse First Boston (Credit Suisse) as its financial adviser in connection with the sale of JAMDAT. Credit Suisse agreed to work on a contingency basis, i.e., Credit Suisse would be paid only if it offered a fairness opinion or if a transaction was consummated. Credit Suisse would be paid $1.5 million if it stated that a proposed acquisition was fair, or 1 percent of the overall acquisition price if there was one. The incentive for Credit Suisse obviously was to recommend an acquisition since only then would Credit Suisse be paid. This was not disclosed in the proxy statement.[2]

Even though JAMDAT's board delegated to Credit Suisse the sole responsibility to negotiate with prospective buyers, Lasky continued to be the sole negotiator with EA with which he continued to deal with directly. As the complaint puts it: "Thus, it is no surprise at all that the Acquisition [by EA] included a guaranty of continued employment for Lasky, and the opportunity to roll over his equity into EA." In fact, Lasky was employed by JAMDAT after the acquisition.

### 4. *The First Offers*

On October 25, 2005, EA offered to buy JAMDAT for $25 per share. At the same time, EA made clear that it would continue to negotiate only on an exclusive basis.

The next day, Yahoo! offered $22 to $26 per share. Yahoo!'s offer was contingent only upon the completion of due diligence; Yahoo! did not request exclusivity.

On October 27, 2005, Credit Suisse reported that it had contacted Microsoft, Viacom and News Corporation, all of which were interested in JAMDAT.

On the same day, Lasky persuaded the board to reject Yahoo!'s bid. Although Lasky pressed for giving EA exclusivity, the board did not go along with this. Credit Suisse backed Lasky.

---

[2] We will return to the proxy statement, which was issued in January 2006.

JAMDAT entered into a confidentiality agreement with News Corporation on November 1, 2005.

5. *Yahoo! and EA*

During November 2005, Yahoo! and EA continued on their respective paths. Yahoo! carried on with its due diligence and prepared a draft agreement, which it submitted to JAMDAT. Toward the end of the month, Credit Suisse informed the board that a higher offer was expected from Yahoo! and that it was nearing the end of its due diligence.

EA, on the other hand, continued to insist on exclusivity and made no other overt moves. Early in November, Lasky told JAMDAT's board that his real reason for engaging in a "one-sided negotiating position with EA" was that EA had promised Lasky and other members of management "lucrative compensation packages that included continued employment and the opportunity to roll over their holdings in [JAMDAT] into EA post-Acquisition."

In the middle of the month, Lasky, without board approval, negotiated the terms of an exclusivity agreement with EA. Also toward the end of November, Lasky informed the board that EA had started due diligence.

On November 21, 2005, JAMDAT's board instructed Credit Suisse to inform Yahoo! that it had to respond with a new offer within a matter of hours. Yahoo! explained that it could not make a revised offer until its executive committee met on November 23, 2005. The proxy statement represented that Yahoo! had declined to make a higher offer, while the truth was that Yahoo! had asked for more time.

6. *JAMDAT Shares Appreciate; EA Gets Exclusivity*

At the end of November 2005, Credit Suisse reported to JAMDAT's board that a $5 appreciation in JAMDAT's shares, if it proved to be sustained, would affect Credit Suisse's analysis of the fairness of EA's proposal.

Rather than losing the EA deal by virtue of the rise in JAMDAT stock, JAMDAT's board now authorized Lasky to sign an exclusivity agreement with EA. "Thus, even though Yahoo had not been allowed the necessary time to make a revised offer, and several other entities stood poised to make competing bids for [JAMDAT], the Board authorized Lasky to enter into an

exclusivity agreement with EA and effectively end any semblance of a competitive bidding process." The agreement "ensured that [JAMDAT] would be sold only to EA, and on terms preferable to EA." The period of exclusivity ended on December 8, 2005.

### 7. The "Force the Vote" Provision

A "force the vote" provision in a merger agreement requires the board of directors to submit to shareholder vote the proposed merger, even if the board itself no longer wants the merger. (The effect of such a provision is to hamper merger discussions with other entities because, until the shareholder vote is taken, it is not known whether the merger that is subject to the vote will or will not take place.) JAMDAT's board initially decided against a "force the vote" provision (because of its effect on other parties such as Yahoo!) but such a provision was in fact included in the EA-JAMDAT agreement. We discuss the shareholder vote below.

### 8. The JAMDAT Board Votes

On December 8, 2005, the board voted to approve the merger agreement with EA for $27 per share. At least four of the five directors "were encumbered by disabling conflicts of interests" when they cast their votes. Those conflicts are set forth in part 10., *post*.

### 9. The Voting Agreements

The board also approved "Voting Agreements" with three board members (Lasky, Vais and Gurley) who together controlled 28.6 percent of JAMDAT stock. The voting agreements issued irrevocable proxies to EA which ensured that at least 28.6 percent of JAMDAT shares would be voted for the acquisition. After the Voting Agreements were signed, the board of directors and management held 50.15 percent of JAMDAT stock, thus "the Acquisition itself became a *fait d'accompli* because the Board and management held voting control over [JAMDAT]."

### 10. What the Directors Gained

In addition to Lasky continuing his employment, the EA acquisition enabled Lasky, Vais and Gurley to monetize their holdings of JAMDAT

shares, i.e., their holdings became liquid, whereas before the merger their holdings were not liquid. This was also true of Rogers who, in addition to the 16.3 percent interest in JAMDAT stock, also held one million shares that would have been tied up in escrow for another three years.

## 11. *The Proxy*

The complaint: "The Proxy failed [to] disclose or did so in a misleading fashion material information that shareholders needed to know before being asked to vote in favor of the Acquisition." The complaint alleges that the proxy failed to disclose the following:

—the acquisition was a *fait accompli* because certain members of the board and company management held voting control of the company and had issued irrevocable proxies to EA;

—the Voting Agreements entered into by Apax and Benchmark were executed by Vais and Gurley, as principals of Apax and Benchmark, and thus effectively bound those directors to vote their shares in favor of the acquisition;

—the board had approved the Voting Agreements without any substantial discussion;

—defendants had contracted around the so-called fiduciary out provision in the merger agreement by entering into the Voting Agreements and agreeing to a force-the-vote provision in the merger agreement;

—the board had discussed and rejected a force-the-vote provision;

—he merger agreement contained a force-the-vote provision despite that fact that such a provision was discussed and supposedly rejected by the board;

—the board did not establish a special committee of independent directors to consider and vote on the acquisition;

—the fact that Vais, Gurley and Rogers were materially interested in the acquisition;

—the amount of the "customary fee" Credit Suisse received for its services and the amount of that fee that was contingent upon the acquisition being consummated;

—information concerning the "various alternatives" to the acquisition that the board purportedly considered;

—the number and type of "various additional parties" that the company contacted and entered into confidentiality agreements with in October and November of 2005, which included Yahoo!, Viacom, Microsoft and News Corporation;

—the range of possible prices contained in the expressions of interest received by JAMDAT from Yahoo ("Company A" in the proxy) on October 26, 2005, and November 3, 2005;

—Credit Suisse never made a counteroffer to Yahoo!;

—the board did not wait to receive a "best and final" offer from Yahoo! before entering into the exclusivity agreement with EA;

—Credit Suisse had given Yahoo! an ultimatum to respond within "hours" with a revised bid;

—the board was concerned that the recent run-up in the company's stock price might impinge on Credit Suisse's ability to opine that the acquisition was fair;

—the company continued to receive inquiries from potential buyers throughout the exclusivity period granted to EA;

—whether any executive signing noncompetition agreements received separate consideration for entering into those agreements;

—whether any shareholder entering into the Voting Agreements, including, but not limited to, defendants Lasky, Vais and Gurley, received separate consideration for entering into those agreements;

—whether growth rates were incorporated into Credit Suisse's selected companies analysis and discounted cash flow analyses in connection with its fairness opinion;

—sufficient information concerning Credit Suisse's selected companies analysis, including the companies selected for comparison, summary data (highs, lows and medians) for their valuation metrics, and how the selections of the reference ranges of the metrics were made (including any supporting analytical detail);

—sufficient information concerning Credit Suisse's selected acquisitions analysis, including the transactions selected for comparison, summary data (highs, lows and medians) for their valuation metrics, that valuation data points were not available for the majority of the acquisitions selected, and how the selections of the reference ranges of the metrics were made (including any supporting analytical detail);

—sufficient information concerning the current and anticipated future amounts of the company's deferred tax assets and how Credit Suisse incorporated them into its discounted cash flow analysis;

—sufficient information concerning the treatment of licensing costs and synergies by Credit Suisse in its discounted cash flow analysis;

—sufficient information concerning the selection of the reference ranges of the weighted average cost of capital made by Credit Suisse in its discounted cash flow analysis (including any supporting analytical detail); and

—the true value of the company's assets.

### PROCEDURAL HISTORY

The original complaint was filed by Elliott M. Fox in December 2005, before the acquisition was finalized. The trial court denied Fox's application for a temporary restraining order barring the acquisition, which then took place.

Fox filed an amended complaint in March 2007. Respondents demurred, contending that (1) the claim based on the breach of the duty of care was precluded by Delaware law; (2) the complaint failed to state facts showing that the duty of loyalty was breached; and (3) the action was barred by the affirmative defense of shareholder ratification. The trial court, per the Honorable Wendell Mortimer, Jr., overruled the demurrer, ruling that the complaint pleaded facts that supported a claim for "breach of loyalty."

Fox moved for class certification but this was denied without prejudice in March 2008.

Appellant Fund was permitted to intervene per a stipulation, and it then filed a complaint in intervention that it contends "closely tracked Fox's amended complaint." Respondents demurred to Fund's complaint, acknowledging that "in virtually all respects" Fund's complaint is "identical to the amended complaint filed by Fox." Respondents again relied on the defense of shareholder ratification. Their demurrer asserted that under "Delaware law, a

fully informed shareholder vote approving a transaction ratifies all actions taken by the Company's directors in furtherance of that transaction." The demurrer also asserted that Fund's complaint was defective in that it did not adequately allege a breach of the duty of loyalty.

The second demurrer, which was brought against Fund's complaint, was heard by the Honorable William F. Highberger, who sustained the demurrer on September 19, 2008. There were three components to the trial court's ruling. As to the claims against the individual directors, the breach of duty of care was barred by "the provisions of JAMDAT's certificate of incorporation and applicable Delaware law. (8 Del. C. § 102(b)(7); *Malpiede v. Townson*, 780 A.2d 1075, 1093–94 (Del. 2001)." The breach of the duty of loyalty claim was barred by the doctrine of shareholder ratification. Finally, as to the claims against the corporation, the trial court concluded that under Delaware law a corporation does not owe a fiduciary duty to its shareholders. (See *Alessi v. Beracha* (Del.Ch. 2004) 849 A.2d 939, 950.) Leave to amend was denied.

A final judgment against Fund was entered on October 21, 2008.

## DISCUSSION

As did the trial court, we discuss the claims against the individual directors separately from those claims against JAMDAT. We start our analysis with a few general principles applicable to demurrers and our standard of review. First, as long as a complaint consisting of a single cause of action contains any well-pleaded cause of action, a demurer must be overruled even if a deficiently pleaded claim is lurking in that cause of action as well. (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 108 Cal.App.4th 1028, 1046 [134 Cal.Rptr.2d 260]; see 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 957, pp. 371–372.) Second, if a cause of action names two or more defendants, the sufficiency of the complaint against one defendant does not immunize the plaintiff against a properly imposed demurrer by another defendant who may separately demur. (See *Majestic Realty Co. v. Pacific Lighting Corp.* (1974) 37 Cal.App.3d 641, 643; 5 Witkin, Cal. Procedure, *supra*, Pleading, § 962, pp. 375–376.) Third, a demurrer accepts as true all well-pleaded facts and those facts of which the court can take judicial notice but not deductions, contentions, or conclusions of law or fact. (*Stonehouse Homes LLC v. City of Sierra Madre* (2008) 167 Cal.App.4th 531, 538 [84 Cal.Rptr.3d 223].) Fourth, the standard of review of a ruling sustaining a demurrer without leave to amend is de novo. Whether leave should have been granted is considered under the abuse of discretion standard, although error is shown if there is any reasonable probability an amendment curing the defect can be made. (*Schifando v. City of Los Angeles*

(2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) Fifth, a demurrer that is sustained on an erroneous ground will nevertheless be upheld on appeal if as a matter of law the complaint fails to state a cause of action. This is a variation of the rule that the appellate court reviews the trial court's *decision*, not its rationale. (*Boon v. Rivera* (2000) 80 Cal.App.4th 1322, 1326–1327 [96 Cal.Rptr.2d 276].)

## A.

### The Claims Against the Individual Directors

1. *The Doctrine of Shareholder Ratification Does Not Bar Fund's Claims*

The trial court concluded that the doctrine of shareholder ratification precluded Fund's claims against the individual directors for breach of the duty of loyalty. The parties agree that this case is governed by Delaware law. We concur that under California's internal affairs doctrine, substantive Delaware law governs.[3]

On January 27, 2009, some four months after the trial court's ruling here, the Delaware Supreme Court handed down its decision in *Gantler v. Stephens* (Del. 2009) 965 A.2d 695 (*Gantler*).[4] After disposing of issues not germane to the case before us, the court turned to the *Gantler* trial court's ruling that the subsequent approval by a disinterested majority of the shareholders legally ratified the decision of the board of directors to reclassify certain shares of the corporation as preferred, rather than common, stock. (965 A.2d at pp. 701, 712.) (The decision of the board of directors was flawed because the majority of the board lacked independence.)

The Delaware Supreme Court in *Gantler* commenced its analysis of the ratification issue with the observation that under "current Delaware case law, the scope and effect of the common law doctrine of shareholder ratification is unclear, making it difficult to apply that doctrine in a coherent manner." (*Gantler, supra*, 965 A.2d at p. 712.) The court noted that shareholder

---

[3] " 'The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.' [Citation.]" (*State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 442 [8 Cal.Rptr.3d 56].)

[4] In its ruling on the demurrer, the trial court correctly relied on the opinion of the Court of Chancery of Delaware in *Gantler v. Stephens* (Del.Ch., Feb. 14, 2008, No. 2392-VCP) 2008 WL 401124 in support of its shareholder ratification analysis. It was only after the ruling on the present demurrer that the Delaware Supreme Court in *Gantler* reversed the chancery court.

ratification has appeared in Delaware cases in two settings. There is "classic" ratification where shareholders approve board action that, legally speaking, could be accomplished without any shareholder approval. But shareholder ratification has also been applied in cases where an informed shareholder vote is statutorily required for the transaction " 'to have legal existence.' " (*Id.* at p. 713.) Ratification in the "classic" setting is a sound concept because it " 'involves the voluntary addition of an independent layer of shareholder approval.' " (*Ibid.*) This feature is obviously missing in cases where the shareholder vote is required.

■ The court then concluded: "To restore coherence and clarity to this area of our law, we hold that the scope of the shareholder ratification doctrine must be limited to its so-called 'classic' form; that is, to circumstances where a fully informed shareholder vote approves director action that does *not* legally require shareholder approval in order to become legally effective. Moreover, the only director action or conduct that can be ratified is that which the shareholders are specifically asked to approve. With one exception, the 'cleansing' effect of such a ratifying shareholder vote is to subject the challenged director action to business judgment review, as opposed to 'extinguishing' the claim altogether (*i.e.*, obviating all judicial review of the challenged action)." (*Gantler, supra,* 965 A.2d at p. 713, fn. omitted.) Without expressly conceding that *Gantler* forecloses the shareholder ratification defense in this case, respondents inferentially admit this to be true.

■ As Fund points out, Delaware Code title 8, section 251(c) requires that a merger must be submitted to the stockholders for a vote. Thus, under *Gantler,* because our case does not involve classic ratification, the defense of shareholder ratification does not apply. It follows that the court's ruling in sustaining the demurrer on that ground was in error.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## B.

### The Claims Against JAMDAT*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1068.

# DISPOSITION

The judgment is reversed as to defendants Paul A. Vais, J. William Gurley, Mitch Lasky, Henk B. Rogers and Michael M. Lynton. The judgment is affirmed as to defendant JAMDAT Mobile, Inc. Appellant is to recover its costs on appeal as against the individual defendants. Respondent JAMDAT is to recover its costs against appellant.

Bigelow, P. J., and Flier, J., concurred.

On June 21, 2010, the opinion was modified to read as printed above.