# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

QC COMMUNICATIONS INC.,          )
                                               )
            Plaintiff,                )
                                               )
      v.                          ) *Civil Action No. 8218-VCG*
                                               )
ANTHONY J. QUARTARONE and Q   )
MEDIA, INC.,                    )
                                             )
           Defendants.        )

## **MEMORANDUM OPINION**

Date Submitted: June 4, 2014
Date Decided: August 15, 2014

Barry M. Klayman, of COZEN O'CONNOR, Wilmington, Delaware; OF COUNSEL: Bernard Chanin, Philadelphia, Pennsylvania, Attorneys for the Plaintiff.

Perry F. Goldlust, of PERRY F. GOLDLUST, P.A., New Castle, Delaware, Attorney for the Defendants.

GLASSCOCK, Vice Chancellor

The Defendant in this matter was a corporate officer and director of the Plaintiff corporation, which owns the radio station at which the Defendant was also employed. The Defendant set up his own corporation on the side. According to the Plaintiff, the Defendant officer sold assets belonging to the Plaintiff, and used his position as a corporate fiduciary to hide the fact that he diverted the proceeds thereof to himself via his own corporation. The Defendant officer maintains strenuously that this is untrue, and testified that he sold only consulting services unrelated to his duties to the Plaintiff through his own corporation. The record evidence convinces me that the Defendant's testimony is untrue, and that he did enrich himself through breaches of fiduciary duty. The Defendant, therefore, must account for those sums wrongfully diverted.

## I. BACKGROUND

A. *QC Communications*

Defendant Anthony "Tony" Quartarone has over thirty years of experience in the radio industry.[1] Many years ago, Quartarone befriended now-retired lawyer Alvin Chanin, who—according to Alvin's son, Steven[2]—"developed an interest in radio broadcasting" through Quartarone.[3] In the late 1980s, Quartarone and Alvin

---

[1] App. to Defs.' Op. Br. in Supp. of Mot. for Summary J. at A008.
[2] I refer to members of the Chanin family by their first names to eliminate any confusion; no disrespect is intended.
[3] Steven Aff. ¶ 7.

formed a small group of investors to purchase a radio station in Ocean View, Delaware, which Quartarone managed until September 1997.[4]

In 1996, Plaintiff QC Communications Inc. ("QC," or "the Company"), a Delaware corporation, was formed to effectuate the purchase of additional radio stations.[5] In 1997, QC purchased two radio stations located in Salem, New Jersey—WJKS-FM ("WJKS") and WFAI-AM;[6] only WJKS is pertinent to the matter before me. The Ocean View station was then sold, and WJKS was relocated to Wilmington, Delaware.[7]

Following QC's incorporation, Alvin became President and Secretary, while Quartarone became Vice President and Treasurer.[8] A five-person board of directors initially governed the corporation, with Quartarone, Alvin, Alvin's wife Myra, their son Steven, and Donald Snyder serving as directors.[9] Over the years, the composition of the board changed slightly, as did the officer positions. As of early October 2012, the Company's officers and directors were Quartarone, Alvin, Myra, and Steven.[10] Through a consent action executed October 4, 2012,

---

[4] *Id.*; App. to Defs.' Answering Br. in Supp. of Mot. for Summary J. at A008.
[5] Steven Aff. ¶¶ 3-4; App. to Defs.' Answering Br. in Opp'n to Pl.'s Mot. for Summary J. and Reply Br. in Supp. of Mot. for Summary J. at A002-03.
[6] Steven Aff. ¶¶ 2-3.
[7] *Id.* at ¶¶ 3, 7.
[8] App. to Defs.' Answering Br. in Supp. of Mot. for Summary J. and Reply Br. in Supp. of Mot. for Summary J. at A004.
[9] *Id.* at A002.
[10] *See, e.g.*, Steven Aff. ¶ 8; App. to Defs.' Answering Br. in Supp. of Mot. for Summary J. and Reply Br. in Supp. of Mot. for Summary J. at A147-48.

Quartarone was removed from his positions as officer and director; his employment was also terminated at this time.[11]

Until October 2012, Quartarone held several employment positions at the station, including General Manager.[12] Although Alvin and Myra spent time at the station each week, Steven—who resides in California and only visited the station once before September 2012[13]—testified that Quartarone was often "the only person of the group regularly physically present at the station."[14]

Steven owns approximately 66 percent of QC's outstanding stock, while Quartarone retains approximately 32 percent.[15]

B. *Kelvyn Ventour*

Kelvyn Ventour, an independent record promoter, worked with Quartarone earlier in his career, prior to QC's purchase of WJKS, as well as during Quartarone's tenure at that station.[16] At deposition, Ventour testified that he often transacted with QC, through his company Kelvyn Ventour Promotions, Inc. ("KVP"), to purchase advertisements, "time buys," that promoted music he was

---

[11] App. to Defs.' Answering Br. in Supp. of Mot. for Summary J. and Reply Br. in Supp. of Mot. for Summary J. at A147-48.

[12] Quartarone Dep. 5:18-24 (explaining that Quartarone was employed at WJKS as "[g]eneral manager, program director, sales manager, account executive, promotions director, promotion copywriter, production," and that he also "maintained the website").

[13] Steven Dep. 26:3-7.

[14] Steven Aff. ¶ 8; *see also* Myra Dep. 5:21-24.

[15] Steven Aff. ¶ 4 (noting that "[a]nother shareholder with a 10% ownership interest was bought out early, and Quartarone gifted 1 share of stock to Manuel Mena").

[16] *See, e.g.*, Ventour Dep. Vol. I 79:13-17.

representing.[17]  Quartarone facilitated most of these transactions on behalf of WJKS.[18]

C. *Q Media*

In April 2003, Quartarone founded Defendant Q Media Inc. ("Q Media"), a Delaware corporation for which he acts as the sole director and officer, and one of two stockholders.[19]  According to Quartarone, this company was established so that he could charge for the consulting services he provided to record companies.[20] Apart from his work for QC, Quartarone testified that he would be hired by entertainers or promoters to listen to a song or record in order to comment on "which format [he] thought the record would work on," and would then be compensated—as Q Media—for his advice.[21]  Quartarone considers the proceeds of this alleged side business to be his separate property, and not that of QC.

Although Q Media predominately conducted this alleged consulting business with Ventour, according to Quartarone, he did not provide consulting *for*

---

[17] *See, e.g.*, *id.* at 10:5-7, 46:18-47:12.
[18] *Id.* at 8:8-20.
[19] *See, e.g.*, Quartarone Dep. 13:19-14:3.
[20] *See, e.g.*, *id.* at 27:5-24.  In fact, Quartarone testified at deposition that he first met Alvin through a consulting engagement. *Id.* at 28:1-8.
[21] *Id.* at 43:13-14; *see also id.* at 300:8-302:17 (describing specific advice Quartarone provided to Ventour); *but see id.* at 245:3-7 ("Q.  Well, can you tell me in 2012—can you tell me in 2012 the name of any project that you consulted on?  A.  No.  Q.  Not a single one?  A.  Nope."); *id.* at 389:19-24 ("A.  Those are records that I consulted on.  Q.  So it is your testimony that this invoice has nothing to do with causing any ADDS?  A.  No.  Q.  Is that yes?  A.  No.").

Ventour.[22] Rather, per Quartarone's testimony, Ventour acted as an intermediary between Quartarone and the artists or record companies.[23] In other words, instead of coming to him directly, "[r]ecord companies would go to Kelvyn; ask Tony what does he think of this record. I would give the advice, and then they would go back to them."[24] Ventour, however, denies that he played such an intermediary role or that he himself purchased consulting services from Quartarone or Q Media.[25]

Despite this purported consulting arrangement, Quartarone initially labeled the invoices from Q Media as charging for "adds." In the radio industry, an add "means that the record is going to be added to the station's playlist,"[26] and, if the station is a reporting station, like WJKS, then this "add" is reported to and tracked by services such as Mediabase and Broadcast Data Systems ("BDS") as songs these stations "are going to or have already started to support by airplay."[27] According to Joshua Medlock, the Director of Affiliate Relations and Integrated Music Marketing for Mediabase, "[t]he 'adds' are important to persons in the recording and broadcasting industry because they reflect which new songs are

---

[22] *See, e.g., id.* at 39:18-40:2.
[23] *See, e.g., id.* at 29:10-17.
[24] *Id.* at 39:18-20.
[25] *See, e.g.,* Ventour Dep. Vol. I 12:12-17, 13:9-11; Ventour Dep. Vol. II 74:25-75:4.
[26] Quartarone Dep. 343:19-20.
[27] Medlock Aff. ¶ 4; *see also* Quartarone Dep. 82:15-23, 84:21-85:2.

6

receiving airplay."[28]  Although Quartarone insists that he was providing consulting and not selling "adds" (the proceeds from which would have belonged to QC), he did not have a credible explanation for why these invoices provided that description.[29]

In addition to tracking those songs "added" by radio stations such as WJKS, Mediabase and other services track "auto adds."  For instance, when WJKS plays a song ten times "and does not log into the system to report 'adds' for the week, the 'auto add' is included in the data base [sic] based on monitoring of the station's airplay by Mediabase;" conversely, "if the station reports any 'adds' for the week or logs into the system and reports no 'adds' for the week, then no 'auto adds' will be included in the data base [sic] for that week."[30]  It is my understanding from the evidence that "spins," an important metric in the radio industry, are individual broadcasts of a record; "spins" accumulate to become an "add" on these reporting services.[31]

---

[28] Medlock Aff. ¶ 4.

[29] Quartarone testified that he initially described the services he was providing as "adds" for a variety of reasons.  He noted that "[t]his was the beginning of the business and I thought something had to be in there.  And 'ADD' was a common term used with the industry." Quartarone Dep. 343:12-14.  He also explained that "I thought something needed to be put in there until I was corrected [by counsel].  Because I billed QC the same way.  QC invoices were billed the same way."  *Id.* at 345:24-346:2.  Quartarone additionally testified that "[i]t was a mistake," *id.* at 360:1, "I have no explanation for that," *id.* at 101:14, "I was a jerk to put it in there," *id.* at 353:19-20, and "I didn't know any better."  *Id.* at 357:7.

[30] Medlock Aff. ¶ 5.

[31] *See, e.g.*, Quartarone Dep. 306:12-24, 364:18-20.

Receiving *undisclosed* payment for "adds and spins" constitutes payola, and is prohibited by federal law. Specifically, 47 U.S.C. § 317, entitled "Announcement of Payment for Broadcast," provides, in pertinent part:

> All matter broadcast by any radio station for which any money, service or other valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, by such person . . . .[32]

Accordingly, this statute mandates that radio stations such as WJKS disclose any consideration received for "spins and adds."

Despite insisting that Q Media was charging for consulting services, Quartarone continued to describe the product sold by Q Media as "adds" for more than two years. Beginning in July 2005, however, Quartarone—purportedly after receiving advice from QC counsel—began to describe the services provided as "consulting" rather than "adds" on Q Media invoices.[33] For instance, Q Media invoices included descriptions such as "consulting Beyouce [sic]" or "consulting Jennifer Lopez."[34] Even after the invoices began to reflect a consulting arrangement, however, correspondence between Quartarone and Ventour, as well as a comparison of Q Media invoices and Mediabase records, indicate that Q

---

[32] 47 U.S.C. § 317(a)(1).

[33] *See, e.g.*, Quartarone Dep. 87:9-11, 305:5-17, 361:22-362:9; *see also* App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 6 at 5; *id.* Ex. 38.

[34] App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 28 (typeface altered from original).

8

Media was actually billing, and receiving payment for, services provided by the station, payment for which should have flowed to QC.[35]

In fact, the Plaintiff points out that most of the songs for which Quartarone is said to have provided "consulting" were added to the station's playlist, and thus reflected on Mediabase reports, within the same time frame.[36] Despite this correlation, Quartarone attempted to convey during his deposition that these adds were unrelated to his consulting. He explained, for instance, that the funds for consulting were often not available "until the add date was available," which could have been "three or four or five weeks" after he consulted on that record.[37] He also testified that it could have been others at the station playing that music[38]—in other

---

[35] *See, e.g.*, *id.* Ex. 33.

[36] To illustrate this correlation, Steven compiled a report comparing the timing of songs that were added to WJKS's playlist with the issuance of Q Media invoices involving those same songs. To prepare this analysis, the station requested and received a copy of its Mediabase "add" history. Medlock Aff. ¶ 7. This history covers a period between August 1, 2006 and December 11, 2012, and differentiates between "adds" and "auto adds." *See id.* at ¶ 8; *id.* Ex. 1. Steven also used historical information from the PowerGold program, explaining how

> [t]he timing of songs played on [WJKS] is controlled by a "playlist" created by the station program director in the PowerGold software. PowerGold permanently retains data as to when songs are entered into its database and the total number of times they are played. Additionally, PowerGold retains a rolling one-year history of exactly what was played, which is available to the station from mid-January 2012.

Steven Aff. ¶ 16. Using the information generated by PowerGold and Mediabase, as well as Q Media invoices, Steven "prepared a report matching the Q Media invoices against PowerGold Initial Entries, the Mediabase Add History, and PowerGold Plays." *Id.* at ¶ 15; *see also* App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 38.

[37] Quartarone Dep. 371:7-11 (typeface altered from original).

[38] *See, e.g.*, *id.* at 298:5-8, 420:16-18, 426:22-427:3.

words, purely coincidental to any "consulting" payment—and noted generally that adds were sometimes automatic.[39]

Nonetheless, Quartarone admitted that he sometimes caused Q Media to erroneously bill for services that were provided by the radio station. However, he testified that, in those instances, he took corrective measures through a self-developed reconciliation process that, according to Quartarone, appropriately attributed payments to QC that were billed by and paid to Q Media wrongly.[40] More specifically, in order to correct for such an error, Quartarone explained:

> On a QC Communications invoice by QuickBooks, I would repeat the artist—title and artist with a zero invoice, with a zero balance due, so that they would not be confused on paying the same artist twice. Then I would put down other titles of projects that belonged to Q Media that would get credited to QC.[41]

In other words, to compensate QC for payments erroneously billed by and paid to Q Media, he would arrange to have a consulting payment owed to Q Media made to QC. That way, according to Quartarone, both companies would be appropriately compensated for the services they provided, QC for services provided by the station and Q Media for consulting. He has no explanation, however, why he employed such a byzantine reallocation scheme, rather than

---

[39] *See, e.g.*, *id.* at 306:12-24, 364:18-20.
[40] *See, e.g.*, *id.* at 131:15-132:19, 148:1-24, 194:13-195:22, 197:2-20, 311:21-314:23; *see also id.* at 150:7-11 (acknowledging that Quartarone "credited" QC without creating a paper record, noting that "[t]here was no—nothing speculating that I had to provide paper records to the station. Didn't have an employment contract. No shareholder's agreement. Nothing prohibiting me from doing any of this"); *id.* at 199:13-23, 204:4-10.
[41] *Id.* at 326:18-23.

simply having funds erroneously received by Q Media transferred to QC. Nor does he explain why these "erroneous" billings were not brought to the attention of anyone at QC. There does not seem to be any discernable distinction between those transactions that Quartarone purportedly reconciled as improperly billed, and those transactions "correctly" allocating revenues to Q Media.

Despite Quartarone's description of Q Media as a consulting business, Ventour testified that he was not paying Q Media for consulting.[42] Instead, Ventour insists that the payments he made to Q Media were for time buys, that is, services provided by the radio station, which would have entitled QC—not Q Media or Quartarone—to payment.[43] In fact, Ventour testified that the reason that his company, KVP, made payments to Q Media was because Ventour was

---

[42] *See, e.g.*, Ventour Dep. Vol. I 12:12-17, 13:9-11. At one time, Ventour had indicated that Quartarone was providing consulting services; however, he later testified that this assertion was false. *Id.* at 14:10-16. Ultimately, he decided to be truthful "because this got really, really serious and I thought I was trying to help Tony because he was in a bad position, but when it got to this level, I decided I got to tell the truth and be done with it." *Id.* at 14:24-15:2; *see also id.* at 76:3-14. Ventour did affirm, however, that he had asked Quartarone his opinion about records that he was involved in promoting. Ventour Dep. Vol. II 17:23-18:1.

[43] *See, e.g.*, Ventour Dep. Vol. I 46:18-47:7. Although some of the invoices provided by Quartarone stated that the services provided by Q Media were for "adds" or "consulting," checks written by Ventour often noted that payment was for "time buys." *See, e.g.*, Ventour Dep. Vol. I Exs. 3-6. Ventour explained:

> I believed Q Media was a part of WJKS and when the invoices came, I put them on my wife's desk, she sent them out, we didn't check all of them, and that's why I said to you before, when you showed me add, the first time I saw that, and consulting, that was the first time I had seen that, and I just assumed I was making time buys, I was getting time buys, so now you're bringing up this add and the consulting, no, I thought I was making time buys, and did I overlook it? Probably, but I don't remember.

Ventour Dep. Vol. II 103:20-104:4.

11

prompted by Quartarone to write checks to that company.[44]  When prompted by Quartarone to make payments this way, he had "just assumed that those two companies [i.e. QC and Q Media] belonged to WJKS."[45]  Ventour was also prompted by Quartarone to send some Q Media payments directly to Quartarone's home address, after Quartarone explained that otherwise the payments would sometimes get lost.[46]  Regardless, Ventour testified that it remained his intention to conduct business with, and to purchase advertising from, the radio station, not Quartarone.[47]

While Ventour continues to conduct business with QC,[48] he has not maintained any business relationship with Quartarone since Quartarone's termination from the station.[49]  In fact, Q Media does not presently conduct any business, consulting or otherwise, and even its bank account has been closed.[50]

---

[44] *Id.* at 71:2-6.  KVP also issued an IRS Form 1099-MISC to Q Media between the years 2005 and 2012 with the following allocations: $48,000 in 2012; $60,216 in 2011; $58,000 in 2010; $67,200 in 2009; $73,500 in 2007; $93,100 in 2006; and $100,700 in 2005.  App. to Defs.' Op. Br. in Supp. of Mot. for Summary J. at A051-57.  There was no 1099-MISC for the year 2008 in the record provided.

[45] Ventour Dep. Vol. II 90:11-12.

[46] Ventour Dep. Vol. I 11:20-26.  In their Answer, the Defendants state that Alvin's wife, Myra, "instructed Defendant Quartarone that checks from KVP and Nana Productions ("Nana") (a company controlled by Kelvyn Ventour) were to be sent to Defendant Quartarone's home. Defendant Quartarone was then to hand deliver to Myra Chanin the payments from KVP and Nana as well as payments to Unity Concerts."  Defs.' Answer ¶ 12.

[47] *See, e.g.*, Ventour Dep. Vol. I 12:18-13:5, 39:10-18; Ventour Dep. Vol. II 71:12-14, 73:19-74:4.

[48] Ventour Dep. Vol. I 73:19-21.

[49] *Id.* at 42:12-20.

[50] Quartarone Dep. 255:23-257:8.

D. *Nana Productions*

One of the other entities that Q Media conducted business with was "Nana Productions," which Quartarone contends was one of Ventour's companies.[51] Conversely, Ventour testified that he did not know of this entity,[52] and that he "made no payments on behalf of Nana [P]roductions."[53]

E. *The Plaintiff's Discovery of Q Media*

Quartarone testified that he informed Alvin orally of his plans to form a company through which he could conduct his consulting work.[54] In fact, he recalled a conversation with Alvin where:

> I said, Al, look, you know, I'm going to form this consultancy company to consult record companies, because I've been doing it since I'm 21, and I'm tired of giving out this information for free. I don't know if it will work, but I'm going to give it a shot . . . . And he goes, let's go 50/50 on it. And, quite frankly, I told him no. Because this is something that belongs to me. This is my opinion, not the station's. This is me that they're coming to. And I said, do you always have to have your hand out? And that's what I told him.[55]

According to Quartarone, Alvin kept the existence of Q Media a secret, and instructed Quartarone "not to report it at the Board meetings."[56] Quartarone also testified that he told other station employees that he was planning to engage in this

---

[51] *Id.* at 154:9-21.
[52] Ventour Dep. Vol. I 24:19-23; Ventour Dep. Vol. II 8:10-11.
[53] Ventour Dep. Vol. I 36:14.
[54] *See, e.g.*, Quartarone Dep. 28:15-29:9, 58:6-23.
[55] *Id.* at 58:6-20.
[56] *Id.* at 58:20-59:5.

consulting business,[57] and that an attorney for QC knew about Q Media.[58] Around 2008, Quartarone also purportedly sent out a press release to the industry "that Q Media had been formed to purchase other radio stations."[59]

The Plaintiff nonetheless contends that, until late 2012, it had no awareness of Q Media's existence.[60] However, in September 2012, Quartarone was suspended from his positions at WJKS following complaints by his co-workers unrelated to the issues in this litigation.[61] Soon thereafter, the Plaintiff began to suspect that Quartarone was diverting revenue from QC to Q Media. As Steven recounts in his Affidavit:

> In the course of the examination of Quartarone's office and the return of his personal effects, we came across TD Bank deposit slips in the name of Q Media, which was an entity unknown to me or to my parents. These deposit slips listed checks and amounts similar to the payments received by the station from Kelvyn Ventour, a record promoter and long term client of the station. The discovery of these

---

[57] *See, e.g.*, *id.* at 46:24-47:4, 48:7-9.

[58] *See, e.g.*, *id.* at 290:2-7; 293:10-13.

[59] *Id.* at 48:10-14; *see also id.* at 51:10-12 (testifying that he told fellow employees that "one day, you know, maybe this company [Q Media] will be able to buy its own station, and then we can move into a bigger market").

[60] Prior to Quartarone's suspension from the station, Ventour had mentioned Q Media to Cynthia Knapper, the station's Traffic Manager, as the pair was attempting to reconcile his account. Knapper Dep. 57:10-22, 68:9-69:23. She later called Quartarone about reconciling checks Ventour had written out to Q Media, and, she explained, "[h]e began yelling at me and subsequently I then—I heard him say 'hold on,' and then I heard Mr. Ventour on the phone and Tony began yelling at Mr. Ventour and questioning what he had told me. I then asked was my presence required anymore on this issue, I had a lot of work to do, did I need to be in the conversation any further, and Tony said no and I hung up." *Id.* at 70:15-22. According to the Plaintiff, this confrontation was disclosed only after Quartarone's suspension from the station, during further inquiries at WJKS following QC's discovery of Q Media. Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. at 6.

[61] Steven Aff. ¶¶ 9-10.

14

documents led us to a further investigation of Q Media and its relationship to the station.[62]

In connection with this discovery, QC requested that Cornerstone Legal Consultants conduct a focused search of Quartarone's computer; this search uncovered QuickBooks files for both QC and Q Media.[63] The Plaintiff also hired a forensic accounting firm, Smart Devine, to "identify the scope of Q-Media's business activities and the revenue generated from those activities."[64] In conducting its analysis, Smart Devine reviewed Q Media's QuickBooks files and tax filings, Q Media's TD Bank records later subpoenaed during discovery in this litigation, and certain of QC's QuickBooks records that were generated by Quartarone.[65]

F. *Promotional Event at the Pale Dog*

On Saturday, September 25, 2010, WJKS hosted an event featuring the artist Jeremih at a Newark, Delaware tavern known as the Pale Dog. From this event, QC was entitled to all cover charge proceeds less expenses.[66] On Monday, September 27, 2010, the first business day following the event at the Pale Dog, Quartarone made a cash deposit of $3,470 into Q Media's bank account at TD

---

[62] *Id.* at ¶ 11.
[63] *Id.* at ¶ 12.
[64] App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 6 at 1.
[65] Steven Aff. ¶ 13; App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 6 at 1-2.
[66] App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 39.

Bank.[67]  The Plaintiff argues that it never received any proceeds from the Jeremih event, and that this deposit represents those proceeds.

Sean Gomes, a QC account executive who was paid to collect the cover charge that night, testified that, following the event, he "put the money into a bank envelope, gave it to [Quartarone], and went home."[68]  Although he did not recall how much money he collected, he recalls that the cover charge was $7 for those who arrived early in the evening, and then $10 thereafter,[69] and that, "[g]iven the low cover fee and the maximum occupancy, the gross could not have been very much.  No one was impressed with the gross."[70]

Melvin Brittingham, who hosted the Pale Dog event, testified that approximately 300 people attended,[71] that the cover charge was perhaps $20 per person,[72] and that Gomes had told him that $5,500 to $6,500 had been collected at the door.[73]  He also testified that Quartarone stood with Gomes by the door during the event.[74]  At deposition, James Himmons similarly estimated that roughly 250 to 300 people attended that event,[75] that Quartarone was "working the door" with

---

[67] *Id.* at TD Bank578.
[68] Gomes Aff. ¶ 5.
[69] *Id.* at ¶ 4 (noting, additionally, that he does "not recall if there were any persons that were let in without paying").
[70] *Id.* at ¶ 5.
[71] Brittingham Dep. 98:22.
[72] *Id.* at 99:11-12.
[73] *Id.* at 101:1-13.
[74] *Id.* at 97:9-14.
[75] Himmons Dep. 36:17-18.

Gomes,[76] and that, "[a]t the end of the night when everybody's clearing out, [he] watched [Quartarone] pay the DJ and take the money and put it in his pocket."[77]

According to Quartarone, however, he was only at the event briefly;[78] he did not obtain possession of the event proceeds until Monday;[79] and station proceeds were only about $1,000, after expenses were paid and he awarded Brittingham a 50% commission, in cash, for organizing the event.[80] Quartarone was not able to recall, at his deposition, where he received the cash for this September 27 deposit, however.[81]

G. *The Audio Jam Transaction*

Quartarone was also involved in selling advertising at the station. The Plaintiff challenges one such transaction. In a March 4, 2011 email, Quartarone wrote to an Audio Jam, Inc. employee that:

> You will have 5 spots a day for 7 days a week in prime time Dayparts for $1,000 per month. Retail value is $10,500.00. Please keep this contract confidential please. [. . .] just let me know when you want me to start. All I would need is copy for the spots. . . . As far as the TV that you are giving me, thank you! ps I am also going to give you that leader board banner as well![82]

---

[76] *Id.* at 37:2-4.
[77] *Id.* at 39:4-7.
[78] Quartarone Dep. 446:3-7, 446:20-447:1.
[79] *Id.* at 446:16-18.
[80] *Id.* at 447:20-448:11, 449:6-15.
[81] *See, e.g., id.* at 456:6-8.
[82] App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 45.

The Audio Jam employee responded later that day, noting "I really appreciate this deal and I would work on the ad and get back to you next few days [sic]. My installer Hugo will call you to come over to take care of your TV as well."[83] It is the Plaintiff's contention that this evidence indicates that Quartarone sold a company asset, advertising time, at a discount, and in return personally received a television set as a kickback.[84]

## II. PROCEDURAL HISTORY

On January 15, 2013, QC filed a Verified Complaint against Quartarone and Q Media. In its Complaint, QC alleges three Counts. Count I alleges that Quartarone breached his duty of loyalty to QC; Count II alleges that the Defendants were unjustly enriched; and Count III alleges conversion and civil theft against Quartarone.

On February 26, 2013, the Defendants moved to dismiss this action for lack of subject matter jurisdiction pursuant to Court of Chancery Rule 12(b)(1). On May 14, 2013, I issued a Letter Opinion denying that Motion.[85]

On May 6, 2014, the Defendants moved to preclude the testimony of the Plaintiff's expert witness, Steven A. Witten, a Senior Manager at Smart Devine. I

---

[83] *Id.*

[84] The Plaintiff explains that "[t]he terms of the new contract [with Audio Jam, entered into in March 2011] represented an 84% discount from the pricing of the prior contract [signed in November 2006], a substantial deviation from the station's customary rates," and argues that "these extraordinarily favorable rates were in consideration of a gift to Quartarone of a TV set for his personal use." Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. at 38-39.

[85] *QC Commc'ns Inc. v. Quartarone et al.*, 2013 WL 1970069 (Del. Ch. May 14, 2013).

heard oral argument on this motion on May 28, 2014, and reserved decision at that time.  For the reasons explained below, I deny this Motion.

On March 14, 2014, the Defendants' filed a Motion for Summary Judgment to Dismiss with Prejudice Plaintiff's Complaint Pursuant to Court of Chancery Rule 56(b).  The Plaintiff moved for summary judgment on April 9, 2014.  On June 2, 2014, oral argument was held on the parties' Cross-Motions.  At that time, the parties agreed to submit the matter for a decision on a stipulated record.  After carefully reviewing the record and the parties' submissions, I find that Quartarone breached his fiduciary duty of loyalty to QC, in part by diverting revenues due to QC to his own company, Q Media.

## III. STANDARD OF REVIEW

A motion for summary judgment pursuant to Court of Chancery Rule 56(b) will be granted "where the record reflects that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[86]  "Where the parties have submitted cross-motions for summary judgment on a stipulated record, as the parties here have done, I may treat the matter as submitted for a decision on the merits."[87]  Because there are irreconcilable

---

[86] *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *10 (Del. Ch. Aug. 9, 2012) (internal quotation marks omitted).
[87] *Farmers for Fairness v. Kent Cnty. Levy Court*, 2013 WL 3333039, at *3 (Del. Ch. July 1, 2013).

19

conflicts in witness testimony, I must assess credibility from the stipulated record.[88]

## IV. ANALYSIS

The Defendants argue that the Plaintiff has failed to demonstrate, or even allege, that it is entitled to the relief it seeks; accordingly, they seek dismissal of the Plaintiff's Complaint with prejudice. In addition to arguing that the Complaint is deficient, the Defendants argue that Quartarone, who did not have an employment contract with QC, could be paid for the consulting services he provided, and that this consulting business—conducted through Q Media—was not usurping an opportunity from QC. The Defendants characterize this litigation as an attempt by the Chanin family "to get rid of a minority shareholder."[89]

Conversely, the Plaintiff contends that, instead of providing consulting services, Quartarone was using Q Media to benefit personally from services that were being provided by the station. According to the Plaintiff, by exploiting the loyalty he derived as director and officer of QC, and as Managing Director of WJKS, Quartarone breached his fiduciary duties to QC.

---

[88] *See, e.g.*, *O'Brien v. IAC/Interactive Corp.*, 2010 WL 3385798, at *4 (Del. Ch. Aug. 27, 2010), *aff'd sub nom. IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174 (Del. 2011) ("Where the parties seek resolution of their dispute on the basis of a stipulated record, . . . the court will draw findings of fact and make conclusions of law based on [the] record in the same manner and with the same binding effect as after a trial.") (internal quotation marks omitted).
[89] Defs.' Op. Br. in Supp. of Mot. for Summary J. at 22.

A. *The Smart Devine Report*

Smart Devine was engaged by QC in connection with this litigation "to identify the scope of Q-Media's business activities and the revenue generated from those activities."[90] In its investigation, Smart Devine reviewed Q Media's QuickBooks files, bank records, and tax filings, as well as "a limited set of plaintiff QC's transactional documents that were [] created and maintained by Defendant Quartarone using QuickBooks for comparative purposes."[91]

Based on its analysis of these records, Smart Devine determined that Q Media revenues between 2003 and 2012 totaled $698,216.[92] These revenues were largely generated through the 287 invoices issued by Q Media during this period, totaling $644,775.[93] Of these invoices, 140 were issued to KVP, the Ventour entity, totaling $342,700, while 142 invoices were issued to Nana Productions in an amount totaling $298,000.[94] Through its "review of the Q-Media bank records . . . [Smart Devine] determined that the invoices posted as Nana Production invoices in Q-Media's QuickBooks file were actually paid by Kelvyn Ventour Promotions."[95]

---

[90] App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 6 at 1.
[91] *Id.*
[92] *Id.* at 2-3.
[93] *Id.* at 3.
[94] *Id.* Additionally, two invoices totaling $4,000 were issued by Q Media to Valerie "Sweets" Marable, and two invoices totaling $75 were issued to Pete Shiavo. *Id.*
[95] *Id.* at 3 n.4.

The Defendants seek to preclude the testimony of the Plaintiff's expert, Steven A. Witten,[96] who authored a report on behalf of Smart Devine. The Defendants argue that his analysis is neither relevant nor reliable; that its probative value is substantially outweighed by its prejudicial effect;[97] and that the methods that were used to generate this report were proprietary and impossible to replicate.

Rule 702 of the Delaware Rules of Evidence, which governs testimony by experts, provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[98]

---

[96] Witten is a Certified Public Accountant and Certified Fraud Examiner, and also has a certification in financial forensics. The Defendants "concede that [Witten] is qualified to give expert opinions," but argue that "even though an expert may be qualified to opine within a recognized 'field', that fact alone does not automatically guarantee reliable and, therefore, admissible testimony." Defs.' Mot. to Preclude at 5.

[97] Rule 403 of the Delaware Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." D.R.E. 403. The Defendants request that I reject Witten's expert testimony under Rule 403 because "the evidence relied upon is meaningless until plaintiff can conclude it lost money," and because "Plaintiff has proceeded, as have others, to work on the conclusion that all 287 invoices constituted the conclusive evidence of the transactions for which plaintiff should be paid." Defs.' Mot. to Preclude at 4. I find these bases for excluding relevant testimony pursuant to Rule 403 unconvincing.

[98] D.R.E. 702.

This Rule "imposes a special obligation on a trial judge to make sure that all expert testimony is not only relevant, but also reliable."[99] Further, "[t]he proponent of the expert testimony bears the burden of establishing its relevance, reliability, and admissibility by a preponderance of the evidence."[100]

I find that the Smart Devine report authored by Witten, which explores "the scope of Q-Media's business activities and the revenue generated from those activities,"[101] is relevant to the issues before me, as well as conducted using reliable standards. Though the Defendants criticize the report as not adhering "to any professional standards,"[102] the report states that Smart Devine's "engagement is a 'litigation services' engagement and is subject to standards applicable to those types of engagements," which "require, among other things, the CPA to have sufficient evidentiary material to support opinions and conclusions expressed during the conduct of an engagement."[103] The Plaintiff further clarifies that "[t]he standards enunciated in the Witten report mirror the standards established by the AICPA [American Institute of Certified Public Accountants] for litigation services."[104]

---

[99] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 593 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010); *see also M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 521-22 (Del. 1999).

[100] *Beard Research, Inc.*, 8 A.3d at 593 (internal quotation marks omitted).

[101] App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 6 at 1.

[102] Defs.' Mot. to Preclude at 2.

[103] App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 6 at 1.

[104] Pl.'s Response in Opp'n to Defs.' Mot. to Preclude at 4.

The Defendants, however, suggest that the limited scope of the engagement, as well as the analysis, undermines the probative value of the Smart Devine report authored by Witten.[105] Moreover, the Defendants argue that Witten's opinion was improperly constrained to an insufficient universe of information, as "the opinion is [] limited to the information provided by [P]laintiff," which "fail[ed] to give Smart Devine enough information."[106] There is no indication in the record, however, that the Smart Devine report was not produced in accordance with the standards set out therein, or that the universe of documents considered or questions explored was so constrained as to undermine the reliability or relevance of this report. In fact, as the Plaintiff notes,

> [t]he Smart Devine presentation, contained in the Witten report, involves no opinions on substantive matters beyond the aggregation of the data contained in the three sources of Q Media financial information: the QuickBooks files maintained by Quartarone, the federal tax returns and related 1099 forms, and the TD Bank records. Using these records, Smart Devine was able to account for the monies received by Q Media and to relate them to the Q Media invoices.[107]

The Defendants, moreover, have not demonstrated that the Smart Devine report contains anything other than a straightforward analysis of the evidence in the record. More specifically, to determine Q Media's total revenue from July 2003 to

---

[105] *See* Defs.' Mot. to Preclude at 2; *see also id.* at 3 (noting that Witten "was not asked to determine if any customer received services from plaintiff and paid Q Media intentionally or in error," and that "[n]o effort was made to examine plaintiff's billing records to see if any of the items listed in the QuickBooks records were, in fact, billed to Kelvin [sic] Ventour and paid to plaintiff").

[106] *Id.* at 2.

[107] *See, e.g.*, Pl.'s Response in Opp'n to Defs.' Mot. to Preclude at 2.

September 2012, Smart Devine aggregated the relevant transactions, based on its review of Q Media's QuickBooks files and banking records, and then conducted a detailed reconciliation process.[108] Smart Devine also compared Q Media invoices to those that Quartarone generated for QC during this period, discovering several correlations between them.[109] The Defendants were free to conduct a similar analysis.

Most importantly, the Plaintiff has clarified that the methods used to generate this report could be replicated by the Defendants, as the Defendants were given access to the technology used to generate this report. Accordingly, I deny the Defendants' Motion to Preclude Testimony of Plaintiff's Expert Witness. In any event, since (as described below) the remedy here is to order Quartarone to account for funds wrongfully removed from QC, the Defendants will have ample opportunity to dispute the conclusions of the Smart Devine report.

B. *Quartarone Breached his Duty of Loyalty to QC*

The Plaintiff contends that Quartarone exploited the trust and opportunity he derived as director and officer of QC, as well as General Manager of WJKS, for his own benefit. Officers and directors of Delaware corporations owe fiduciary duties

---

[108] *See* App. in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summary J. Ex. 6 at 2-4.

[109] *See id.* at 5-6.

of care and loyalty to those corporations for which they serve.[110] This means, in part, that "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests."[111] I find, for the reasons explained below, that Quartarone breached his fiduciary duty of loyalty to QC.

It is clear from the record that Quartarone was not providing consulting services through Q Media but was instead diverting to himself revenues generated using station assets. As a fiduciary, Quartarone owed a duty of loyalty to the Company, which he breached in the most fundamental way possible when diverting revenues owed to QC to his own company, Q Media.

Although Quartarone contends that Q Media served as a vehicle for him to receive payment for his consulting to record companies, I do not find his testimony credible. Moreover, his testimony is not corroborated by the counterparty to this alleged arrangement, who denies that any consulting took place and insists that he intended to purchase services from the station. Although Ventour acknowledged that record companies were interested in Quartarone's opinion,[112] he explained that the payments Q Media received on his behalf were not for consulting, but for services that could only be provided by QC. Notably, Quartarone has stopped providing any "consulting" since his termination from QC and Q Media's bank

---

[110] *See Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009). Because Quartarone owed fiduciary duties as a QC director and officer, I do not address whether he owed fiduciary duties to QC as its General Manager.

[111] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

[112] *See, e.g.*, Ventour Dep. Vol. II 33:22-34:5.

account has been closed. That, to me, indicates that Quartarone was not providing any services independent of those products—whether time buys or adds—requiring the use of station assets. Accordingly, I find that, by diverting assets from QC, for which he acted as a director and officer, to Q Media, Quartarone breached his fiduciary duty of loyalty to QC.

Quartarone, as a fiduciary of QC, was also prohibited from converting that company's assets to his own use, or exploiting those assets for his personal benefit. It is clear from the record that Quartarone retained proceeds belonging to QC from the 2010 Pale Dog event, and used his position at QC to extract a television set from a QC customer, as part of a sale of QC assets. Through this conduct, Quartarone committed additional breaches of fiduciary duty.

As a result of Quartarone's breaches, I find that the Plaintiff is entitled to recover those revenues diverted to Q Media from QC, as well as the proceeds appropriated from the Pale Dog event and the value, if any, diverted from QC in the sale of advertising to Audio Jam. That recovery is in line with this Court's recognition that "once disloyalty [by a fiduciary] has been established, the standards evolved in the Delaware courts require that a fiduciary not profit

27

personally from his conduct, and that the beneficiary not be harmed by such conduct."[113]

The Defendants argue that the Plaintiff is not entitled to recover under its theory of the case, which is that Quartarone was accepting money for adds and spins—services that could only be provided by the station—because that would amount to payola and the Plaintiff is not entitled to reap the rewards of this illegal activity. In essence, the Defendants argue that the Plaintiff's recovery is barred by its unclean hands.

The unclean hands doctrine is an equitable doctrine this Court may invoke when "a party's particularly egregious conduct offends the integrity of this Court."[114] Under this doctrine, the Court "may refuse[] to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals."[115] I find the doctrine of unclean hands inapplicable here. Even assuming that Quartarone was involved in payola, and that Q Media was receiving payments for such services, the Defendants have not demonstrated how the Plaintiff corporation is implicated in Quartarone's illegal conduct. In fact, if Quartarone was intentionally engaging in illegal payola on the part of QC, those acts amount to bad faith, another breach of the duty of loyalty he

---

[113] *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010).
[114] *Oracle Partners, L.P. v. Biolase, Inc.*, 2014 WL 2120348, at *18 (Del. Ch. May 21, 2014).
[115] *Id.* (internal quotation marks omitted).

owed to the Company. As such, I find it inappropriate to apply the doctrine of unclean hands here.

Having found that Quartarone breached his fiduciary duties to QC, and that the doctrine of unclean hands does not bar the Plaintiff's recovery, I must now determine the amount of damages appropriate here. The Plaintiff requests $701,686 plus interest and costs, which accounts for those revenues diverted from QC to Q Media between 2003 and 2012, as well as the proceeds from the Pale Dog event; the Plaintiff does not quantify any additional damage caused by the Audio Jam transaction. Before I determine damages, however, I find it appropriate to provide the Defendants with an opportunity to contest what, if any, payments to Q Media were not received in connection with services employing station assets. Therefore, I direct Quartarone to account for all revenue diverted to himself or Q Media that is rightfully owed to QC. In an accounting, the burden is on the fiduciary,[116] and Quartarone consequently must demonstrate what portion, if any, of the cash flow to Q Media is not attributable to QC.[117]

---

[116] *See, e.g.*, *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *16 (Del. Ch. May 31, 2000) ("An agent or fiduciary is under a duty to keep and render accounts and, when called upon for an accounting, has the burden of proving that he properly disposed of funds which he is shown to have received for his principal or trust.") (internal quotation marks omitted); *see also Carlson v. Hallinan*, 925 A.2d 506, 537 (Del. Ch. 2006), *opinion clarified*, 2006 WL 1510759 (Del. Ch. May 22, 2006) ("Corporate officers and directors, like all fiduciaries, have the burden of showing that they dealt properly with corporate funds and other assets entrusted to their care.") (internal quotation marks omitted).

[117] *See, e.g.*, *Dweck v. Nasser*, 2012 WL 3194069, at *1 (Del. Ch. Aug. 2, 2012) ("It is elementary that in this accounting phase, [the party submitting the accounting] bears the burden

Lastly, the Plaintiff alleges that the Defendants have been unjustly enriched, based on the diversion of revenue from QC to Q Media, and that Quartarone has committed conversion and civil theft. As I have already found that Quartarone breached his fiduciary duty of loyalty by engaging in the misconduct that forms the basis for these additional allegations, and that QC is, as a result, entitled to recovery of the diverted assets, I do not address these claims, which would, if resolved in the Plaintiff's favor, lead to the same recovery already granted.[118]

## V. CONCLUSION

For the reasons explained above, I grant partial judgment for the Plaintiff, pending a determination of damages. If the Defendants wish to contest the Plaintiff's measure of damages, they should file a memorandum to that effect within twenty days of the date of this Memorandum Opinion. The Plaintiff shall respond within twenty days of the Defendants' Opening Memorandum, and the Defendants may submit a Reply Memorandum within fourteen days thereafter.

If the Defendants do not submit any additional memoranda, I will determine the appropriate amount of damages owed to QC in a subsequent opinion,

---

of proving both the accuracy of its accounting and the propriety of the underlying transactions.") (internal quotation marks omitted).

[118] *See, e.g.*, *Frank v. Elgamal*, 2014 WL 957550, at *32 (Del. Ch. Mar. 10, 2014) ("Since a plaintiff is entitled to only one recovery after trial, if a breach of fiduciary duty claim survives summary judgment, then an entirely duplicative unjust enrichment claim premised on the exact same theory of liability would not only be unnecessary, but also redundant. Such is the case here. The elements of proof are the same, and so are the possible recoveries.") (footnote omitted); *see also MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010).

based on the record currently before me.  An appropriate Order accompanies this

Memorandum Opinion.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| QC COMMUNICATIONS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) *Civil Action No. 8218-VCG* |
| | ) |
| ANTHONY J. QUARTARONE and Q | ) |
| MEDIA, INC., | ) |
| | ) |
| Defendants. | ) |

## ORDER

AND NOW, this 15th day of August, 2014,

The Court having considered the parties' Cross-Motions for Summary Judgment, submitted on a stipulated record, and for the reasons explained in my August 15, 2014 Memorandum Opinion, IT IS HEREBY ORDERED that the Defendants' Motion for Summary Judgment is DENIED and that the Plaintiff's Motion is GRANTED as to liability.

SO ORDERED:


/s/ Sam Glasscock III
Vice Chancellor

32